# **EXHIBIT 1**

**Exhibit 1**

Plaintiffs copied almost verbatim large portions of their Video Privacy Protection Act ("VPPA") argument from an opposition brief filed by other plaintiffs in *In re Vizio*. The columns below show which portions of the *Vizio* brief Plaintiff copied. Defendants have highlighted in matching colors the duplicated sections for ease of reference. The language from the Plaintiffs' brief is on the left and the original language from the *Vizio* brief is on the right.

| *White v. LG, et al.*, No. 17-1775 (MCA) (SCM) (D.N.J.), Dkt. 56<br><br>**Plaintiffs' Opposition to Defendants' Motion to Dismiss** | *In re Vizio, Inc.*, No. 8:16-ml-02693-JLS (KESx) (C.D. Cal.), Dkt. 121<br><br>**Plaintiffs' Opposition to Defendants' Motion to Dismiss** |
|---|---|

**I. Plaintiffs' Statutory Privacy Claims Are Well-Pled**

Plaintiffs have adequately pled their statutory privacy claims.

    **A. Plaintiffs' VPPA Claims Are Well Pled**

    Enacted in 1988, the Video Privacy Protection Act ("VPPA") provides that "[a] *video tape service provider* who knowingly discloses, to any person, *personally identifiable information* concerning any *consumer* of such provider shall be liable to the aggrieved person . . . ." 18 U.S.C. § 2710(b)(1); Video Privacy Protection Act of 1988, S. 2361, 100th Cong., 102 Stat. 3195 (1988) (emphasis added). The Act allows consumers "to maintain

---

**II. Plaintiffs' Statutory Privacy Claims Are Well-Pled.**

Plaintiffs have adequately pled their statutory privacy claims.

    **A. The VPPA**

    Congress enacted the VPPA to allow consumers "to maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8 (1988). The VPPA protects consumers by requiring that their consent be obtained before their personal video-viewing histories can be divulged. Vizio seeks dismissal of this claim for three reasons: it is not a qualifying "video tape service provider," plaintiffs are not "consumers,"

control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599 at 8 (1988). The VPPA also protects consumers by requiring that their consent be obtained before their personal video-viewing histories can be divulged.

Defendants seek to dismiss Plaintiffs' VPPA claims, arguing that they are not "video tape service provider[s]," that Plaintiffs are not "consumer[s]" as defined by the statute, and that Defendants do not disclose "personally identifiable information." Each argument misreads the VPPA; the instant Complaint; and the Third Circuit's (and other courts') interpretation of the statute.[6]

### 1. Defendants Are "Video Tape Service Providers"

Defendants deliver through Smart TV software streaming video directly to consumers homes through the software that Defendants developed for its Smart TVs. Compl. ¶¶ 39, 54. Using Defendants' platforms, the user can select videos from various video libraries, including Hulu's, Amazon's and Netflix's, for instant delivery. Id.[7] By using Defendants' video-delivery software service, Defendants collect certain private information about the user. Compl. ¶¶ 41-69.

and the information it discloses is not "personally identifiable information." Each argument misreads the VPPA and the complaint.

### 1. Vizio is a "video tape service provider."

Vizio delivers streaming video directly to consumers through proprietary "discovery and engagement" software that Vizio developed for its Smart TVs. Compl. ¶ 38. Using Vizio's platform, the user can select videos from various video libraries, including Hulu's and Netflix's, for instant delivery. Id. at ¶ 45. In exchange for using Vizio's video-delivery software service, Vizio collects certain information about the user.

Vizio competes directly with other video delivery services, such as Roku. Indeed, when Plaintiff DeLaurentis discovered that Vizio was collecting and disclosing his personal information, he "deactivate[d] the data collection and sought a workaround by purchasing and using a Roku to stream video content." Id. at ¶ 18.

Against this backdrop, Plaintiffs alleged that Vizio qualifies as a "video tape *service* provider" because it is a "person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or *delivery* of prerecorded video cassette tapes or *similar audio visual*

2

Against this backdrop, Plaintiffs have properly alleged that each Defendant qualifies as a "video tape service provider" because it is a "person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or *similar audio visual materials*[.]" 18 U.S.C. § 2710 (emphasis added). That is, the Complaint precisely alleges that each Defendant is not merely a television manufacturer; they also clearly provide consumers with a service: *the delivery of streaming video* (i.e., "*similar audio visual materials*") through their Smart TV platforms. Indeed, Plaintiffs (like virtually every purchaser of a Smart TV) purchased their Smart TVs in part because Defendants' technology brings the video rental store into the home, allowing Plaintiffs to access video on demand through Defendants' Smart TV interface.[8]

Defendants contend they are not video tape service providers under the VPPA. However:

> The plain text of the statute provides otherwise. As an initial matter, Congress's use of a disjunctive list (i.e., 'engaged in the business . . . of . . . rental, sale, or delivery') materials[.]" 18 U.S.C. § 2710 (emphasis added). It is quite odd, then, for Vizio to say that Plaintiffs "do not" allege that Vizio delivers any "similar audio visual content" to them. MTD 16. That is precisely what they allege—that Vizio is not merely a television manufacturer, it also provides them a service: the delivery of streaming video ("similar audio visual materials") through its discovery and engagement platform. Indeed, Plaintiffs purchased these Smart TVs in part because Vizio's technology brings the video rental store into the home, allowing Plaintiffs to access video on demand through Vizio's proprietary interface.
>
> Vizio next argues that companies like Hulu, which are accessible through Vizio's video-delivery software, are necessarily the only "video tape service providers" within the arrangement. But the VPPA does not require that conclusion. The VPPA simply asks whether an interstate business is engaged in the delivery of "similar audio visual materials," which includes streaming video. *See In re Hulu Privacy Litig.*, 2012 WL 3282960, at *5-*6 (N.D. Cal. Aug. 10, 2012 (holding Hulu qualified as a "video tape service provider" because it helped deliver television and movies through the Internet for free). Vizio points to no limitation in the text of the VPAA that says there can be only one video service provider

unmistakably indicates that Congress intended to cover more than just the local video rental store. Indeed, lest the word 'delivery' be superfluous, a person need not be in the business of either renting or selling video content for the statute to apply. Further, Congress's use of the phrase 'similar audiovisual materials' indicates that the definition is medium-neutral; the defendant must be in the business of delivering video content, but that content need not be in a particular format.

In re Vizio, Inc., 238 F. Supp. 3d 1204, 1221. See also In re Hulu Privacy Litig., No. C 1103764 LB, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012). Accord In re Nickelodeon Cons. Priv. Litig., 827 F.3d at 290 (3d Cir. 2015).

As the statutory text supports Plaintiffs' position -- not Defendants' -- so does the legislative history. The VPPA was of course enacted before this type of technology existed, but "Congress was concerned with protecting the confidentiality of private information about viewing preferences *regardless* of the business model or media format involved." Hulu, 2012 WL per viewing experience. Instead, under a plain reading of the text, *any* company that provides this service must obtain consent before disclosing individuals' personal viewing-histories. And as a factual matter, receiving video services here requires comparable use of Vizio's proprietary interface as it does Hulu's.

As the statutory text supports Plaintiffs' position, not Vizio's, so does the legislative history. The VPPA was of course enacted before this type of technology existed, but "Congress was concerned with protecting the confidentiality of private information about viewing preferences *regardless of the business model or media format involved.*" *Hulu*, 2012 WL 3282960, at *6 (emphasis added). Congress may not have imagined the technology Vizio has developed to deliver streaming video through licensing agreements with content providers like Hulu, but it "cast such a broadly inclusive net in the brick-and-mortar world, [that there is] no reason to construe its words as casting a less inclusive net in the electronic world when the language does not compel that we do so." *See Yershov*, 820 F.3d at 488 (discussing "subscriber"). Congress's choice of language in defining "video tape service provider" fairly brings Vizio's video-delivery service within the VPPA, and therefore "it is unimportant

3282960, at *6 (emphasis added). Congress may not have imagined the technology Defendants have developed to deliver streaming video through licensing agreements with content providers like Hulu, but it "cast such a broadly inclusive net in the brick-and-mortar world, [that there is] no reason to construe its words as casting a less inclusive net in the electronic world when the language does not compel that we do so." See Yershov v. Gannett Satellite Info. Network, Inc., 820 F.3d 482, 488 (discussing "subscriber").

Thus, in addition to the fact that, on its face, each Defendants clearly provide an in-home video delivery service to consumers, Congress's choice of language in defining *video tape service provider* also fairly brings Defendants' video-delivery service within the VPPA, and therefore "it is unimportant that the particular application may not have been contemplated by the legislators." Barr v. United States, 324 U.S. 83, 90 (1945).

Accordingly, the VPPA's protections plainly *do* apply to a business that runs a video-delivery service through software designed to bring the video-rental store into the home—which is that the particular application may not have been contemplated by the legislators." *Barr v. United State*s, 324 U.S. 83, 90 (1945).

Note also that in 2012, shortly after the *Hulu* decision referenced above, Congress "considered the impact of the VPPA on the electronic distribution of video and chose only to make consent easier to obtain, rather than limiting the reach of the Act in the absence of consent." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 488 (1st Cir. 2016) (citing 158 Cong. Rec. H6849–01 (Dec. 18, 2012)). Importantly, Congress did not alter the definition of "video tape service provider," which Hulu concluded covered businesses "dealing in digital conduct" such as video streaming. 2012 WL 3282960, at *4. This "supports an inference that Congress understood its originally-provided definition to provide at least as much protection in the digital age as it provided in 1988." See id. (reaching similar conclusion concerning meaning of "consumer"); *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of . . . judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

In a final effort to evade the application of the VPPA, Vizio likens

precisely why each Defendants *is* a qualifying "video tape service provider."

### 2. Plaintiffs are subscribers and hence consumers.

Next, Defendants argues that Plaintiffs are not "consumers" under the VPPA. The statute defines "consumer" to include a "subscriber" of goods or services from a video tape service provider. 18 U.S.C. § 2710(a)(1). Though the word subscriber is not defined therein, its ordinary meaning includes one who receives electronic texts or services by subscription. Yershov, 820 F.3d at 487.

In Yershov, the First Circuit held that an individual who accesses news and entertainment media content, including videos, through a proprietary mobile software application on his mobile phone qualifies as a "subscriber" within the meaning of the VPPA. The app was free, but the court rejected the argument that monetary payment is necessary to qualify as a subscriber. 820 F.3d at 487. Instead, it found that the use of the mobile app generated information about that user that the defendant collected, and this was sufficient to establish a subscriber relationship. Id.; see also

itself to a landlord who simply rents space to Hulu. But this analogy cannot be squared with the allegations in the complaint, which describes Vizio as an active participant in the video delivery-service market: Vizio developed software and entered licensing arrangements to have certain video content available on demand through its Smart TVs, so that it could charge a premium for its Smart TVs. Compl. ¶¶ 45-48, 81. Vizio also suggests that if it is a video tape service provider, then so is a shipping company, a blu-ray player, and a car, because all "deliver" video in a literal sense. Vizio then ascribes that bizarre reading to Plaintiffs. But it is Vizio that is reading the word "delivery" in isolation to extend the statute's application far beyond what Congress would have wanted. The VPPA's consent requirements do not apply to anyone—only a qualifying video tape service provider. A shipping company that delivers DVDs is not a video tape service provider—it is a mail provider. The same goes for the other examples: those businesses and items do not transform into providers of video services by the mere act of "delivering" video. But the VPPA's protections plainly do apply to a business that runs a video-delivery service through software designed to bring the video-rental store into the home—which is precisely why Vizio is a qualifying "video tape

Hulu, 2012 WL 3282960, at *8 (concluding plaintiffs were subscribers of Hulu, notwithstanding that they watched videos on Hulu for free, in part because Hulu collected their data in exchange for viewing).[9]

Simply put, Plaintiffs here used Defendants' proprietary Smart TV platform to watch video, and Defendants collected and sold (and continue to collect and sell) Plaintiffs' and consumers' personal data when they do, such as computer addresses and the addresses of other electronic items connected to Wifi, and what, where and when consumers watch -- which can be then be used (and are used) by Defendants, with the help of data aggregators, to reveals the *electronic location* of Defendants' and other devices connected to Plaintiffs' Wifi (i.e., geolocation data). Compl. ¶¶ 38, 49, 57, 154. Defendants also collect this data so that they can push personalized ads to their devices as well as consumers' *other* devices. Compl. ¶¶ 45-47. "[A]ccess was not free of a commitment to provide consideration in the form of that information, which was of value to" Defendants. See Yershov, 820 F.3d at 489. And it was not free in a different sense: Defendants sell Smart TVs with this service provider."

### 2. Plaintiffs are subscribers and hence consumers.

Next, Vizio argues that Plaintiffs are not "consumers" under the VPPA. The statute defines "consumer" to include a "subscriber" of goods or services from a video tape service provider. 18 U.S.C. § 2710(a)(1). Though the word subscriber is not defined therein, its ordinary meaning includes one who receives electronic texts or services by subscription. Yershov, 820 F.3d at 487.

In Yershov, the First Circuit held that an individual who accesses news and entertainment media content, including videos, through a proprietary mobile software application on his mobile phone qualifies as a "subscriber" within the meaning of the VPPA. The app was free, but the court rejected the argument that monetary payment is necessary to qualify as a subscriber. Id. Instead, it found that the use of the mobile app generated information about that user that the defendant collected, and this was sufficient to establish a subscriber relationship. Id.; see also Hulu, 2012 WL 3282960, at *8 (concluding plaintiffs were subscribers of Hulu, notwithstanding that they watched videos on Hulu for free, in part because Hulu collected their data in exchange for viewing).

7

"streaming video" technology (at a premium) in order to allow consumers to have regular, and easy, access to video delivery services in their homes. Ironically and absurdly, all along Defendants were and are secretly using those same delivery services to reap millions of dollars off the personal, private information from unsuspecting consumers.

In these ways, Plaintiffs have alleged a sufficient relationship with Defendants' video delivery services, such that Plaintiffs are clearly "subscribers" under the VPPA.

### 3. Defendants Disclosed Plaintiffs' and Class Members' "Digital Identities" Constituting *Personally Identifiable Information*.

The VPPA provides that "the term 'personally identifiable information' <u>includes</u> information which identifies a person . . ." § 2710(a)(3) (emphasis added). Unlike other definitions of "personally identifiable information" which list specific types of data as qualifying, this is an example of a "standard" which is "open rather than closed in nature" and "can evolve and remain flexible in response to new developments." Paul M. Schwartz &

As in *Yershov*, Plaintiffs here used Vizio's proprietary discovery and engagement platform to watch video, and Vizio collects their personal data when they use this platform, such as MAC addresses, which reveals geolocation data. Vizio also collects this data so that it can push personalized ads to their devices. "[A]ccess was not free of a commitment to provide consideration in the form of that information, which was of value to" Vizio. *See id*. at 489. And it was not free in a different sense: Plaintiffs allege they paid a premium for this technology in order to have regular, and easy, access to these video delivery services. In these ways, Plaintiffs have alleged a sufficient relationship with Vizio's video delivery services, such that it is a subscriber.

*Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015), is not to the contrary. *Ellis* concluded that plaintiff's acts of downloading and using a free mobile device application from the Cartoon Network did not make him a "subscriber" under the VPPA, but the court believed that the user of the application in that case did not have "to provide any information to Cartoon Network." *Id*. at 1254; *accord Yershov*, 820 F.3d at 488.

*Austin-Spearman v. AMC Network Entm't LLC*, 98 F. Supp. 3d 662

8

Daniel J. Solove, *The PII Problem: Privacy and A New Concept of Personally Identifiable Information*, 86 N.Y.U. L. Rev. 1814 (2011). That Congress chose to define "personally identifiable information" in terms of a standard is evident from its use of the word "includes." This word "normally implies that the proffered definition falls short of capturing the whole meaning." Yershov, 820 F.3d at 486; see also United States v. Gertz, 249 F.2d 662, 666 (9th Cir. 1957) ("The word 'includes' is usually a term of enlargement, and not of limitation."). The legislative history confirms this reading. Id. (noting "official Senate Report expressly stating that the drafters' aim was 'to establish a minimum, but not exclusive, definition of personally identifiable information.'" (quoting S. Rep. No. 100–599, at 12)).

Congress's approach makes great sense for two reasons. For one, "many types of information other than a name can easily identify a person." 820 F.3d at 489.[10] It can depend on the context. "[W]hen a football referee announces a violation by 'No. 12 on the offense,' everyone with a game program knows the name of the player who was flagged." Id. For another, the ability of any given

(S.D.N.Y. 2015), is also distinguishable. The court concluded that a user of cable television website, who alleged that the owner of website disclosed her video-viewing history to a social network of which she was a member, failed to plead that she was a "subscriber" of the website because she only alleged episodic and random visits to the website. This fell far short of an "ongoing relationship between provider and subscriber," which could be otherwise established "by affirmative action on the part of the subscriber, so as to supply the provider with sufficient personal information to establish the relationship and exchange." *Id*. at 669.

Here, as noted above, the allegations are quite different and in line with those found to be sufficient in *Yershov*. For these reasons, Plaintiffs are "subscribers."

**3. Vizio disclosed personally identifiable information.**

The VPPA provides that "the term 'personally identifiable information' includes information which identifies a person . . ." § 2710(a)(3). Unlike other definitions of PII which list specific types of data as qualifying, this is an example of a "standard" which is "open rather than closed in nature" and "can evolve and remain flexible in

9

information to identify individuals may change over time. 86 N.Y.U. L. Rev. at 1836.

Here, Plaintiffs allege that Defendants video-streaming platforms disclose substantial, extensive information about Plaintiffs' and consumers' digital identities; namely, consumers' video-viewing history, consumers' computer addresses, and information about other devices connected to the same Wifi network. Compl. ¶¶ 45-47. That alone satisfies the VPPA pleading standard laid down by the Third Circuit in In re Nickelodeon Cons. Priv. Litig., 827 F.3d at 290 (3d Cir. 2015).

Moreover, the court in Vizio – a similar case as to this one – explained why VPPA claims there were be upheld under the standard laid down by the Third Circuit in Nickelodeon:

> The Court need not disagree with *In re Nickelodeon* because Plaintiffs allege that Vizio's Inscape platform discloses even more about their digital identities—in particular, consumers' MAC addresses and information about other devices connected to the same network. Plaintiffs allege that MAC addresses are frequently linked

response to new developments." Paul M. Schwartz & Daniel J. Solove, *The PII Problem: Privacy and A New Concept of Personally Identifiable Information*, 86 N.Y.U. L. Rev. 1814 (2011).

That Congress chose to define PII in terms of a standard is evident from its use of the word "includes." This word "normally implies that the proffered definition falls short of capturing the whole meaning." *Yershov*, 820 F.3d at 486; *see United States v. Gertz*, 249 F.2d 662, 666 (9th Cir. 1957) ("The word 'includes' is usually a term of enlargement, and not of limitation."). The legislative history confirms this reading. *Id.* (noting "official Senate Report expressly stating that the drafters' aim was 'to establish a minimum, but not exclusive, definition of personally identifiable information.'" (quoting S. Rep. No. 100–599, at 12)).

Congress's approach makes great sense for two reasons. For one, "many types of information other than a name can easily identify a person." *Id.* It can depend on the context. "[W]hen a football referee announces a violation by 'No. 12 on the offense,' everyone with a game program knows the name of the player who was flagged." *Id.* For another, the ability of any given information to identify individuals may change over time. 86 N.Y.U. L. Rev. at 1836. Consistent with that approach, in

to an individual's name and can be used to acquire highly specific geolocation data. (Compl. ¶¶ 69-71.) MAC addresses allegedly can also identify a person when combined with Vizio's disclosure of consumers' IP addresses, zip codes, product model numbers, hardware and software versions, chipset IDs, and region and language settings. (Id. ¶¶ 72-79.) Besides collecting and disclosing extensive information regarding consumers' Smart TVs, Vizio supposedly collects and discloses information about all other devices connected to the same network. (Id. ¶¶ 63, 72.)

In re Vizio, Inc., 238 F. Supp. 3d 1204, 1224. See also Yershov, 820 F.3d at 489. Here, Plaintiffs have made similar allegations, and the same reasoning applies.

Plaintiffs' allegations also detail how this information links viewing data to specific individuals, including the creating by Defendants of a digital "fingerprint" of every user in a home and Defendants' ability to scan a users' Wifi network. Compl. ¶¶ 44, 49, 52, 56, note 19. Plaintiffs describe how addresses are unique to

*Yershov*, the defendant (a publisher of a mobile news app) allegedly disclosed what videos a person watched on his or her smartphone and the GPS coordinates of the phone's location at the time the videos were watched. The court concluded that "[g]iven how easy it is to locate a GPS coordinate on a street map, this disclosure would enable most people to identify what are likely the home and work addresses of the viewer[.]" *Id*.

Here, Plaintiffs allege that Vizio discloses Plaintiffs' video-viewing history and other information that is "reasonably and foreseeably likely to reveal which" videos Plaintiffs obtained. *See Yershov*, 820 F.3d at 486. Their allegations detail how this information links viewing data to specific individuals, including by pinpointing the location of Plaintiffs' Smart TVs. Compl. ¶¶ 68-73. Plaintiffs describe how MAC addresses are unique to Plaintiffs' Smart TVs and other electronic devices and serves as a wireless beacon that regularly broadcasts the device's precise location. *Id*. at ¶ 69. Plaintiffs allege Vizio discloses this data for not only the Smart TVs themselves, but all media sources connected to the Smart TVs and networks. Compl. ¶¶ 63, 72. These allegations plausibly state a claim under the VPPA.

Vizio offers two responses. It *agrees* that the disclosure of "GPS

11

Plaintiffs' Smart TVs and consumers' other electronic devices. Id. Plaintiffs allege Defendants disclose this data for not only the Smart TVs themselves, but all media sources connected to consumers' Wifi. Compl. ¶¶ 38, 49, 57, 154. These allegations also plausibly state a claim under the VPPA. Nickelodeon, 827 F.3d at 290. See also Yershov, F. Supp. 3d at 135; In re Vizio, Inc., 238 F. Supp. 3d 1204, 1225.12

Further, the Complaint alleges Defendants disclose other personally identifiable information that is "reasonably and foreseeably likely to reveal which" videos Plaintiffs obtained. Compl. §§ 46-48. See also Yershov, 820 F.3d at 486; In re Vizio, Inc., 238 F. Supp. 3d at 1224 ("The First Circuit in Yershov concluded that *personally identifiable information* . . . embrace[s] "information reasonably and foreseeably likely to reveal which . . . videos [the plaintiff] has obtained."). 820 F.3d at 486.

Defendants argue that this is not what they are doing and ask the Court to hold that the confidential and identifying personal information about consumers that Defendants steal, store, and sell to third parties (i.e., specific information that identifies what a user

coordinates *or similar information*" with video-viewing histories "trigger[s] application of the VPPA." MTD 19 (emphasis added) (citing *Yershov*, 820 F.3d at 486). But it says this is not what it is doing, and it asks the Court to hold *as a matter of law* that the information it discloses, such as MAC addresses, do not provide, as Plaintiffs allege, "highly specific geolocation data" that identify where they watch these videos. As Vizio knows, this factual argument is improper at the pleadings stage. *E.digital Corp. v. Toshiba Am. Info. Sys., Inc.*, 2014 WL 12516081, at *3 (S.D. Cal. July 10, 2014). The Court would be forced to decide a dispute of scientific fact at the pleadings stage. This includes whether MAC addresses in fact identify the precise location of Plaintiffs' Smart TVs where they watch videos, or whether the disclosure of MAC addresses are the equivalent of GPS coordinates.[4] "[S]uch arguments are better suited for a motion for summary judgment on a more developed record." *E.digital Corp.*, 2014 WL 12516081, at *3; see *Yershov*, 104 F. Supp. 3d 135, 145 (D. Mass. 2015) ("the factual record would need to be developed before concluding that an Android ID is not PII"); *In re Hulu Privacy Litig.*, 2012 WL 3282960, at *7 (N.D. Cal. Aug. 10, 2012) ("Plaintiffs do not have to plead their evidence to give fair notice of their

12

watches; how long a user watches; and where they watch videos, as Plaintiffs allege) (see, e.g. Exhibit 1 attached to the Complaint) does not violate the VPPA *as a matter of law*. As Defendants know and explained in detail above, this factual argument and inquiry – a dispute of scientific fact – and is entirely improper in a technology case at the pleadings stage. See E.digital Corp. v. Toshiba Am. Info. Sys., Inc., 2014 WL 12516081, at *3 (S.D. Cal. July 10, 2014). "[S]uch arguments are better suited for a motion for summary judgment on a more developed record." E.digital Corp., 2014 WL 12516081, at *3. See also In re Vizio, Inc., 238 F. Supp. 3d 1204, 1225.

The Court should also not accept Defendants' offer to engage in judicial fact-finding or make sweeping determinations as a matter of law on this Motion to Dismiss. Yershov, 104 F. Supp. 3d at 145 ("the factual record would need to be developed before concluding that an Android ID is not PII"); In re Hulu Privacy Litig., 2012 WL 3282960, at *7 (N.D. Cal. Aug. 10, 2012) ("Plaintiffs do not have to plead their evidence to give fair notice of their claims."); See also In re Vizio, Inc., 238 F. Supp. 3d at claims.").

Vizio cites a single case, *Perry v. Cable News Network*, in which the district court dismissed a VPPA claim, finding that "Plaintiff has merely pled that Defendants disclosed his MAC address along with the viewing history tied to that address. He has not, however, pled any facts to establish that the video history and MAC address were tied to an actual person and disclosed by Defendants." Case No. 1:14-cv-02926-ELR, Dkt. No. 66, at 10 (N.D. Ga. April 20, 2016). Citing plaintiff's complaint, the court described a MAC address as "a unique numeric string assigned to network hardware in the iPhone." *Id.* at 2 n.3. There is no mention of geolocation data or its disclosure. The allegations the court described in its order, and on which it granted dismissal, are not comparable to Plaintiffs' allegations here.[5] At the pleadings stage, "the Court must accept as true all allegations of material facts that are in the complaint and must construe all inferences in the light most favorable to the non-moving party." *Retrophin, Inc. v. Questcor Pharm., Inc.*, 41 F. Supp. 3d 906, 910 (C.D. Cal. 2014). Plaintiffs have alleged enough facts to plausibly demonstrate that Vizio is disclosing information that is reasonably and foreseeably likely to reveal which videos Plaintiffs obtained—such as

1225-1226 ("Plaintiffs will have to demonstrate that Defendants' disclosures are 'reasonably and foreseeably likely to reveal' what video content Plaintiffs have watched. . . .. But this is a factual inquiry ill-suited for resolution on a motion to dismiss.") (emphasis added).

At the pleadings stage, the Court must accept as true all allegations of material facts that are in the complaint and must construe all inferences in the light most favorable to the non-moving party." In re Horizon Healthcare Servs., Inc. Data Breach Litig., 846 F.3d 625 (3d Cir. 2017). Plaintiffs have alleged enough facts to plausibly demonstrate that Defendants have unlawfully disclosed, and are continuing to unlawfully disclose, personal information about consumers that is reasonably and foreseeably likely to reveal, which videos Plaintiffs obtained, where they obtained those videos, and for how long they were watched. "Having informed [Defendants] of the factual basis for their complaint, [Plaintiffs] were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim." See Johnson v. City of Shelby, Miss., 135 S. Ct. 346, 347

"highly specific geolocation data" pinpointing the location of their Smart TVs. "Having informed [Vizio] of the factual basis for their complaint, [Plaintiffs] were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim." See Johnson v. City of Shelby, Miss., 135 S. Ct. 346, 347 (2014).

(2014).

For the reasons stated above, Plaintiffs VPPA claims should stand.

**Footnotes:**

6   "[W]hen [a] statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004) (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997).

7   In this regard, Defendants compete directly with other video delivery services, such as Roku. See https://article.wn.com/view/2018/01/17/Roku_Introduces_New_Metrics_for_OTT_Advertising_Campaigns/

**Footnotes:**

4   The complaint notes that "retail analytics firms have used MAC addresses to pinpoint customer locations—a practice which the Federal Trade Commission ("FTC") has investigated," and that the data supplied by MAC addresses provides a correlated look-up table. Compl. ¶¶ 71, 79. Given these allegations, which must be accepted as true, with all inferences drawn in Plaintiffs' favor, it would not be appropriate to conclude that "the linkage of information to identity" is "too uncertain." *Yershov*, 820 F.3d. at 486.

5   Even on its own terms, *Perry* is wrong. Far more persuasive is the district court's decision in *Yershov*, 104 F. Supp. 3d 135 (D. Mass. 2015), which the First Circuit affirmed, albeit by emphasizing location data. There, the district court concluded that any unique identifier— including a person's smartphone ID—is personally identifiable information. *Id*. at 145-46. The reasoning of the district court in *Yershov* would support a finding that MAC addresses are PII even in

⁸ Companies like Hulu, which are accessible through Defendants' video-delivery software, are not the only "video tape service providers" within the arrangement. The VPPA simply asks whether an interstate business is engaged in the delivery of "similar audio visual materials," which includes streaming video. See In re Hulu Privacy Litig., 2012 WL 3282960, at *5-*6 (N.D. Cal. Aug. 10, 2012) (holding Hulu qualified as a "video tape service provider" because it helped deliver television and movies through the Internet for free). Instead, under a plain reading of the statute, any company that provides this service must obtain informed consent before disclosing individuals' personal viewing-histories and confidential, identifying information.

⁹ In Yershov, the First Circuit concluded that a consumer need not make a monetary payment in return for a mobile application to be considered a "subscriber." 820 F.3d 482, 488-89 (1st Cir. 2016). Instead, the plaintiff's provision of personal information in return for the defendant's video content was

the absence of allegations regarding location-based data. location of their Smart TVs. "Having informed [Vizio] of the factual basis for their complaint, [Plaintiffs] were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim." *See Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (2014).

16

sufficient consideration for the plaintiff to be a "subscriber." Id. at 489. See also In re Vizio, Inc., 238 F. Supp. 3d 1204.

[10] "Congress contemplated that the Act would protect more than just a person's name or physical address." See also In re Vizio, Inc., 238 F. Supp. 3d 1204, 1224. Besides collecting and disclosing extensive information regarding consumers' Smart TVs, Plaintiffs allege that Defendants collect and disclose information about all other devices connected to the same network. See, e.g., Compl. ¶¶ 45-47.