UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WHITE, et al.,

Plaintiffs,

vs.

SAMSUNG ELECTRONICS AMERICA, INC.,

Defendant.

Case No. 17-cv-01775

Newark, New Jersey
April 16, 2024

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JESSICA S. ALLEN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES (the parties appeared in person):

For the Plaintiffs: GREGORY SONAM MULLENS, ESQ.
Calcagni & Kanefsky, LLP
1085 Raymond Boulevard, 14th Floor
Newark, NJ 07102
(862) 208-1888
gmullens@ck-litigation.com

LESLEY E. WEAVER, ESQ.
Bleichmar Fonti & Auld LLP
1330 Broadway, Suite 630
Oakland, CA 94612
(415) 445-4004
Lweaver@bfalaw.com

Audio Operator:

Transcription Service: KING TRANSCRIPTION SERVICES, LLC
3 South Corporate Drive, Suite 203
Riverdale, NJ 07457
(973) 237-6080

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(APPEARANCES continued)

For the Plaintiffs: JOSHUA SAMRA, ESQ.
Bleichmar Fonti & Auld LLP
1330 Broadway, Suite 630
Oakland, CA 94612
(415) 445-4017
Jsamra@bfalaw.com

For the Defendant: MICHAEL R. MCDONALD, ESQ.
Gibbons, PC
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4500
mmcdonald@gibbonslaw.com

JONATHAN M. SPERLING, ESQ.
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1153
jsperling@cov.com

CELIN CARLO-GONZALEZ, ESQ.
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000

JORDAN S. JOACHIM, ESQ.
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1086
Jjoachim@cov.com

(Commencement of proceedings)

THE COURT: Okay. We're here on the record in the matter of White versus Samsung. It's 17-1775.

May I please have appearances beginning with plaintiffs.

MR. MULLENS: Good afternoon, Your Honor. Greg Mullens from the law firm of Calcagni & Kanefsky, local counsel for plaintiffs.

THE COURT: All right. Good afternoon.

MS. WEAVER: Good morning, Your Honor. Lesley Weaver, Bleichmar Fonti & Auld, also on behalf of the plaintiffs.

MR. SAMRA: Good afternoon, Your Honor. Josh Samra of Bleichmar Fonti & Auld, also on behalf of plaintiffs.

THE COURT: Who do we have for defense?

MR. MCDONALD: Yes, good afternoon, Your Honor. Michael McDonald from Gibbons PC on behalf of Samsung --

THE COURT: Okay.

MR. SPERLING: Good afternoon, Your Honor. Jonathan Sperling, Covington & Burling, for defendant. Together with me, I have also Jordan Joachim and Celin Carlo-Gonzalez, also of Covington & Burling.

THE COURT: Okay. All right.

So I had a call on April 12th, last Friday. I

resolved some discovery disputes.

Not surprised to see that you were not able to resolve the disputes that we had talked about on Friday, three of which, I said, if you couldn't resolve, we'd have to have a meet-and-confer today. It sounds like zero progress has been made on that and that the Court, to the extent I can, to the extent I even understand what the disputes are -- because, quite frankly, your submission of April 15th was not helpful at all to the Court.

So we'll see if I can help --

FEMALE SPEAKER: Looks like your mic's out again.

THE COURT: My mic was out?

FEMALE SPEAKER: It's back.

THE COURT: Thank you.

So the three issues that we're going to talk about -- and hopefully the Court can resolve -- are related to profits, which is related to plaintiff's Document Request 38 -- and query whether these are separate or related disputes; I've come to realize that they are related disputes -- this matching database production and the fingerprint data dispute, which relate to the Court's March 14th order, paragraphs 10, 4, and 12, and then also, as I mentioned in my April 15th order, to the extent you couldn't resolve it, to have a meet-and-confer today.

And in terms of the discovery disputes, that's all

I'm going to discuss today. I am not going to discuss content ID and associated titles, as I mentioned. But -- and I had directed the parties to have a meet-and-confer, and if you couldn't have a meet-and-confer, then I would direct you to come to the Court to have a meet-and-confer on April 25th.

I will revise that part of my order. I am not going to require you to submit another letter to me by April 24th. I am not going to require you to appear on April 25th.

I have your positions, and I'm going to make a ruling. Not today, but I will issue a short written ruling on that.

Now, we're going to talk about this issue related to profits and damages and Request Number 38.

So Request Number 38, the plaintiff's Request Number 38 reads: [As read] Documents -- and this is coming from other requests that was provided to me as part of the March 1st, 2024, submission, Exhibit C -- documents sufficient to establish for each day, month, and year, of the relevant time period the profits made by you as a result of (A) your implementation and use of ACR; and (B) your use of any data collected by ACR on Samsung Smart TVs. Responsive information will include monthly, quarterly, and annual financial reporting reflecting this information, as well calculations reflecting the average revenue per user, changes

to monetary or retail value relating to changes to Samsung's disclosures to users; and financial reporting, internal and external, valuing the data collected by ACR as an asset.

Now, the dispute, as I understand it -- and this is coming from your April 8th letter -- is the difference in how what I think plaintiff is seeking and how the defendants are interpreting this request.

You should be able to resolve that through a meet-and-confer, but it seems like the parties have not been able to do so. So here we are.

To the extent the defense is arguing that it's not relevant, that request, that's a little bit confusing to me. I admit, in reviewing the plaintiff's request, it's not the best-crafted request. It's vague to a certain extent.

However, the gist of it, as I understand it, is -- the request is asking for documents related to profits that the defense -- that the defense got, based on its collection of -- the data, I should say, collected through the ACR.

In the April 8th letter, the defense noted, we take that data that was collected, and we use that data that -- ACR, I'll call it, data, the data collected through ACR, to help place ads. And then the profits SEA makes are as a result of selling advertising. And the plaintiff is looking for information, I think, related to that.

Now, to extent the defense has an objection on

relevancy, I'd like to know what it is because, again, I am not here to address the merits of the claims or the defenses, but, clearly, under the wiretap statute, it does provide in terms of for recovery the sum of actual damages suffered by the plaintiff, any profits made by the violator. Query whether there's been a violation. But that's what the statute allows.

And while I will agree with the defense, there may be a proportionality argument, here's what I'm trying to understand.

I will tell you where I'm headed. I'm finding -- I find that the request is relevant. If your argument is going to be or your objection is -- because it asks, like I said, for documents that show profits based on SEA's use of data collected by ACR on SEA's Smart TVs, and it comes down to whether or not there are documents that you keep in the ordinary course of business that you have that would show their profits.

Now, very well may be those records show profits based on other stuff. I don't know.

And I am not saying that you have to create something. I am not saying you open up the financial records and give them everything.

But based on the April 8th letter, where the defense acknowledges that it uses the ACR data to help place

the ads and then you profit as a result of selling advertisements, it doesn't matter, I don't think, that you sell a profit -- sell the data itself. To say that there isn't some recommendation to the profits based on the data that's collected, I think is a very narrow interpretation.

So, again, I am not saying you give them everything. I am not saying you maybe maintain it based on quarter, per user -- I think that gets a little bit unduly burdensome. I am not even sure you maintain it that way.

But to the extent there is -- there are documents that somehow show what the profits are, based on the data collected through the ACR, that's relevant.

So let me hear from the defense.

MR. SPERLING: So two points, Your Honor. We're certainly not arguing what the statute says.

So first of all, SEA doesn't have profits from the use of ACR data. SEA sells advertising. Plaintiff has sworn testimony -- and I'm quoting from a deposition that they took last week: [As read] Advertising on the Samsung platform can be targeted based on what content the advertiser is viewing. Advertising can be not targeted at all. Advertising can be targeted by geography. Advertising can be targeted based on other audience segments other than ACR audience segments. So there's a whole variety of factors that go into the selling of advertising. And there's nothing that breaks it out.

And so we didn't refuse to respond to their request. We said, in response to their request -- sorry, Your Honor; I have to flip back to it -- that after a reasonable search, we had not located any documents sufficient to establish for any quarter or year -- those are the things that they asked -- the applicable time period, the profits made by Samsung as a result of those two things that they say: implementation or use.

And they have the sworn testimony that says, okay, we don't have that, and we don't break that out. It's one of many factors that can or can not going into the sale of advertising.

THE COURT: But read that one -- you said you don't -- how did you respond? That you don't have ...

MR. SPERLING: Documents sufficient to establish for any quarter or year of the applicable time period -- because that's what their request sought -- sufficient to establish for each quarter and year.

THE COURT: No. The part -- I'm sorry. You said is about use or implementation. What did you say about that?

MR. SPERLING: That there are not documents sufficient to establish the profits made by Samsung of (A) implementation and use of ACR by Samsung or (B) use by Samsung of data collected on Samsung Smart TVs through ACR.

THE COURT: So -- all right. I hear you.

But how do you square that with in your April 8th letter, you acknowledge that SEA uses the ACR data to help place the ads. Right? And then profit as a result of selling the ads.

So I am not sure saying -- I don't blame you -- and it's not me judging how financial records are kept -- right? -- and how profit loss -- I am not talking about any of that.

But I think there's a distinction between saying -- and I want to make sure I understand what your objection is. It's one thing to say -- and I don't think you're saying it's not relevant. You're saying we don't have any documents maybe that spells it out this way or breaks it down this way.

That's different than is there a way -- are there documents that show how the data, I guess, was used to help place the ads, and then, based on the ads, how you determine what the profit is based on that? How the ads are placed?

MR. SPERLING: So, Your Honor, I don't think that there are. That's a different question than the one that they asked.

But I want to be clear: There are two issues here. One is whether we have any profits of the type that are within scope of the statute.

THE COURT: Right.

MR. SPERLING: Right? So not arguing with

relevance saying we don't have that because what we have is a sale of advertising based on a whole host of factors which may or may not include ACR data, among others, okay, with respect to -- with respect to an ad campaign. All right?

And then rolled into everything, potentially including some consideration of ACR data and potentially not, then there's an ad campaign, and there can be ad revenue. Right?

We don't have anything, okay, that separates out that allows you to say, okay, this comes from the use of ACR; this doesn't. These are profits associated with the use of ACR. Okay? These aren't.

So the two points are related, but they're conceptually distinct. One is we don't have profits of that -- right? -- unless one takes the most attenuated possible U of sort of causation or relationship where it doesn't matter, you know, A leads to B leads to C leads to D all the way down to Z.

And consistent with that, we don't have documents of the type that they're asking for. They don't exist. We went. We investigated. We don't have that.

THE COURT: All right. Let me hear from plaintiffs.

MS. WEAVER: I think Your Honor is generally correct about what we're seeking. We got testimony last week

that, yes, Samsung receives revenue based on the use of ACR data. To the extent it is commingled with other information also used to place ads, we're entitled to the discovery of the profits that they make.

THE COURT: Well, wait a minute.

MS. WEAVER: Yeah.

THE COURT: -- so let's -- the first question is the first question.

But as to the second, they're required to produce discovery to the extent it exists -- right? -- and maintained in the ordinary course of business.

If they're saying they don't have documents as consistent with how you've asked for it -- right? -- responsive information -- will include the monthly, quarterly, annual financial reporting reflecting this information as well as calculations reflecting the average revenue per user; changes to money or retail value relating to changes in Samsung's disclosures to users and financial -- if they say they don't have it, then what?

MS. WEAVER: So, Your Honor, we have dealt with this in many other cases, and let me just say, with regard to the request, what we would accept is anything, documents sufficient to show the calculation of revenue based on, you know -- in other cases, it's been interest-based advertising, which is what --

THE COURT: When you say in other cases --

MS. WEAVER: Yes.

THE COURT: -- are you saying in other wiretap case SmartTV cases like this?

MS. WEAVER: Not SmartTV, but cases involving use of data that is alleged to be improperly taken to personalize ads.

And often -- I know that they do keep records for interest-based advertising.

THE COURT: How do you know they keep that?

MS. WEAVER: I -- well, Your Honor, they can -- you can ask them. I would be shocked because they do -- as a matter of recordkeeping, interest-based advertising is subject to marketing events. They've marketed it here.

I did -- this was a 30(b)(6) topic. And the deponent did not know and would not answer whether or not they do break it out. But we were entitled to that testimony, and we did not get it.

The question of whether or not -- if they can't break it out, then the law -- and I wish -- Your Honor, I wasn't prepared on this today, and I apologize, but we can get you law on the commingling.

If they cannot break out the profits otherwise, then we should get the total amount. I would be shocked to learn that they cannot break it out. They -- this deponent

was supposed to be able to testify about it. He said he could not, and he told us to go to accounting.

All I'm saying is for interest-based advertising, relying on ACR, which is --

THE COURT: When you say -- tell me what you mean by "interest-based advertising," because I may have a different understanding of what you're talking about.

MS. WEAVER: Yeah, no, that's fine.

Your Honor, the information is used -- that is taken through ACR is collecting what people are watching --

THE COURT: I get it. I get that.

MS. WEAVER: Yeah. Okay.

THE COURT: So you're saying what? The consumer's interests, they have it broken down by, like, say, fishing versus sporting versus cooking? What are you saying?

MS. WEAVER: Not the -- so when -- well, (A) that is a different question.

So, yes, they do --

THE COURT: I'm just --

(Simultaneous conversation)

THE COURT: Just to be clear --

(Simultaneous conversation)

MS. WEAVER: No, let me -- let me explain where --

(Simultaneous conversation)

THE COURT: Just a second, though.

MS. WEAVER: Okay.

THE COURT: Because I'm a little confused because that's not what your request is asking for, this interest-based -- so that's what I'm a little concerned if we're going down a different path.

MS. WEAVER: It's -- no, no. We are not.

It's how Samsung markets the use of ACR data. And we can produce documents that were marked in the deposition last week.

So when Samsung is facing advertisers, they say, "Hey, we have this ACR data that we use so you can target people."

THE COURT: I get it.

MS. WEAVER: And that is what the advertisers pay for.

And I just find it implausible that there is not a breakout -- I don't believe that Samsung Ads recognizes only one big top like that advertising number. It must be breaking out interest-based revenue, A. And, B, even if they don't, what has happened in other cases involving this kind of targeted use of data for advertising is they simply produce a spreadsheet. It's -- they could do it on a quarterly basis for a year for the relevant time period. It -- and then they don't have to go -- I am not asking for a thousand emails. I'm just asking for the numbers.

THE COURT: All right.

What say you about this breakout for the ads?

(Simultaneous conversation)

THE COURT: Yeah.

MR. SPERLING: Yes, Your Honor. To my understanding, interest-based advertising by no means needs to implicate ACR; right? That's the testimony --

(Simultaneous conversation)

THE COURT: But that's the problem: We don't know. See? That's the issue here; right?

MR. SPERLING: No, but we should --

THE COURT: -- is you use the data, you collect the data, and when you collect the data, you need it for the ads. And then it gets sold.

So, look, guys, I am not going to spend an hour on this, but I'm trying to find a path forward here. There's got to be a way for you to be able to -- I understand that maybe you don't maintain records with respect to profits based on buckets for -- all right -- how the ACA [verbatim] collected data versus other data that you collected that's not ACR technology.

I understand you may not have the buckets broken down that way for the topic.

But there must be a way to somehow -- if you can't do it that way, then based on the data that's collected --

right? -- based on the interests of the consumers from the SmartTV and then somehow that's used for targeted ads or interests, interested ads. Isn't there a way to do it that way? It's not just, okay, here's how much profits we've made for all the ads.

MR. SPERLING: So I think that's my point, Your Honor, which is that interest-based advertising, to my understanding -- I am not expert in this -- can, as the witness testified, turn on whole variety of demographic considerations -- right? -- or data that is not ACR data.

So grabbing the interest-based advertising revenue or whatever it is, would not provide the information that they're looking for. It would be a much larger bucket; right? It includes lots of other things without any ability to pull out, okay, even the portion that they're asking for, setting aside the question of whether that's really use or not.

So that's the issue.

And the suggestion that we should go, to the extent we could, and create spreadsheet creates whole another level of issue, which is, you know, when people say "documents sufficient to establish" -- so there's kind of two ways as the Court knows, that's --

But the more legitimate way is you may have 10,000 documents that all establish this fact. I don't need all

10,000; I just need one or the two, whatever it is.

And then version two is to sort of do my homework for me. You go figure out what documents, if I piece them together, will prove the fact that I, the person making the request, want to prove.

This seems --

THE COURT: But they could have easily just said "any and all documents related to profits generated from the collection of ACR data," as opposed to -- I agree with you. That's why I said, it's not the way I would have drafted a request. I am not here to -- this. I mean, I could. I could.

But at the end of the day, it's about asking for documents related to the profits.

MR. SPERLING: So, Your Honor, I'm going to make a proposal.

Again, my understanding is this just doesn't exist. It is not broken out. But we'll undertake to go back with the benefit of what plaintiff has just described, okay, and confirm once again whether there is something that exists -- okay? -- exists -- okay? -- that --

THE COURT: I'm assuming it won't.

MR. SPERLING: I am --

THE COURT: You're going to be right back here.

MR. SPERLING: So, then, Your Honor, I don't know

what to do. I'm trying to proceed in the best faith possible. Okay. We went. We inquired. We're told it doesn't exist. Okay? Plaintiff's counsel's representing everyone else does such-and-such. I'm prepared to go back and inquire about.

But Your Honor's a hundred percent right: I expect that we're going to come back and say this information is not maintained.

THE COURT: So -- all right. Here's the -- here's the thing with your request, though. Responsive information will include monthly, quarterly, and annual financial reporting reflecting this information as well as calculations reflecting the average revenue per user.

Again, changes to monetary or retail value -- so that's how you requested it; right? You've said you want it to be monthly, quarterly, annual financial reporting reflecting this information. What happens when they come back and say, "We don't have anything. We don't have anything."

That's the request.

MS. WEAVER: Well, I understand your point, Your Honor. We're seeking damages information here. We have had plenty of meet-and-confers about that particular request.

We did try to narrow it. I think you're right: We could have asked for any and all. We tried to be very, very

targeted in this case.

If the defense representation is parsing what we're seeking for so narrowly to say they don't exist, then I guess we have to go back and ask for any and all or have some discovery of how they keep it.

And then once we get into that, then we can ask something more targeted.

THE COURT: No. Here's what I'm going to do. I'm going to direct the defense to go back -- I find this request to be relevant.

Whether or not you have responsive information to this particularly worded request remains to seen.

So to the extent there's an objection on relevance in terms of -- not as you said, Mr. Sperling, the idea that you can't have damages, as part of your damage remedy, profits by an alleged violator, but whether or not in this case, there really is any profits, I am going to say that the request itself is relevant. And I find that it's relevant, as I said, based on the representations in the April 8th letter where defense acknowledged that, although it says it doesn't make profits as a result of using ACR data, while SEA uses ACR data -- this is on page 5 of 6 -- quote, [As read] While SEA uses ACR data with many other types of data not collected through ACR to help place ads, its profits are as a result of selling advertising. It does not sell or profit

from the data itself. Plaintiff can explore this at a deposition to confirm there are no documents sufficient to establish any SEA profits from ACR, closed quote.

It sounds like maybe the deposition testimony did not definitively address that issue.

That said, I find, given the broad scope of discovery, that this request does seek information that is relevant to plaintiff's claim, the wiretap claim, with respect to the issue of damages.

Whether or not documents actually exist is a different story. And so I find that the request is relevant. And I find that to the extent the defense has any documents, they are to look for them and then produce them by no later than April 26th.

If the answer is "I don't have any," which is what I am anticipating is going to happen, then I'm going to have to determine whether or not there -- plaintiff is correct in arguing that courts have found that defendants have been compelled in similar situations to provide wholesale documents about profits that don't break down actually the specific profits affiliated with the alleged data that was allegedly deceptively collected. I don't know the answer to that. But you're going to have to brief it, and I'm going to give you a very, very short letter brief to do it because this shouldn't be an overly complicated issue.

So if you can't -- if the answer is "We don't have anything," and plaintiff is still going to insist that, well, they should be -- they should either on their own or be compelled to provide more general documents about profit, as courts have done elsewhere, then you can brief that in a letter brief no more than five pages for the plaintiff, May 3rd, a letter brief and cite any cases, supporting cases.

And then defense can respond by May 10th.

That's how I'm going to handle that. Okay. So that takes care of that issue. Okay. Five pages, both sides. Double-spaced.

Now, the issue about the matching data production and fingerprint data, I understand from my law clerk that the parties seem to be unable to even agree on what data means.

So I went back, looked at the hearing from March 12th. And I understand the matching database is a server where the fingerprint data is sent.

But the question is whether or not defendants have or haven't produced the data that the plaintiff has been seeking, whether the defendant has provided sufficient exemplars.

So I think a good place to start is the plaintiff's second amended complaint. And the plaintiff's second amended complaint sets forth in detail the specific data that the defendant SEA has allegedly deceptively intercepted and

allegedly without the plaintiff's consent and to whom the defendant then discloses this information allegedly for profit.

And I think it's important that discovery be tied to the claims and the defenses in the case. And so those are guardrails that have to be kept in place in terms of determining what is the proper scope of discovery.

I am not going to revisit any rulings that I made in September of 2023 on what realtime data is or fingerprint data is or matching databases. If you want to talk about moving this case forward, limit your requests and your responses to what the allegations and the claims are in the case.

So if we can't reach a resolution today, this case is never going anywhere if you can't even agree on what data is being sought and what data you've collected.

So the second amended complaint, Docket Entry Number 88, for example, paragraph 2, alleges the defendants have violated the federal and state privacy rights of consumers by failing to obtain informed consent, by deceptively and unreasonable intercepting, storing, and unilaterally disclosing to third-party consumers digital identities; namely, the consumer's private information, sensitive viewing histories, personal preferences, contents of conversations, and other critical information particularly

useful to uniquely identify individuals and their location. Such private information wrongfully disclosed by defendant also includes but is not limited to the online services a consumer visited and the presence of a consumer's other internet-connected devices.

It goes in paragraph 3: [As read] Defendant -- and I admit, this is a -- defendants because at the time Sony was involved in the case and it's since been dismissed.

[As read] Defendants also secretly collect and disclose to third parties, IP addresses, their media access control addresses, and ZIP codes.

Paragraph 4: [As read] Defendants accomplish this massive data mining enterprise through their use of an invasive automatic content software, which we've been referring to as ACR, that is secretly installed by the defendants on millions of their Smart TVs, including the plaintiff's Smart TVs at issue, and the defendants unilaterally disclose consumer's personally identifiable information and other consumer data to advertisers and media content providers.

And then it goes on. It goes on for many, many paragraphs. And it continues to describe what the specific data is and how the ACR technology is used to collect the data. For example, paragraph 38: [As read] Defendants developed and use a business platform for the SmartTV

industry that rests on utilizing the ACS technology to capture in real time billions of viewing data points each day for millions of consumers' Smart TVs manufactured and sold by the defendant.

Paragraph 39: [As read] Since 2012, defendants have manufactured Smart TVs that continuously monitor and track in real time what consumers are watching; what consumers are saying; and the viewing habits of those consumers.

Paragraph 41: [As read] Defendant's ACS enables defendants to monitor and identify plaintiff's and the class members' video viewing habits, personal information, and voice content.

And, again, it goes on paragraphs 44, paragraphs 44, 45, 46, 47.

In paragraph 46, for example, it says, [As read] Defendant's ACS tracking software works by analyzing bits of the video and other visual programming its customers are watching in real time. The technology then allows defendants to determine, amongst other information, the date, time, channel of programs, and whether consumers watched this program in real time or from a recording. And it cites as a footnote, cognitive networks automatic content software platform diagram, which is attached to the complaint as Exhibit 4.

And that all gets tied to the wire fraud violation -- excuse me -- or the wiretap statute, which is the remaining claim in the case, which in the second amended complaint is paragraph 167: [As read] The interception was acquired during transmission. Defendant's ACS operated in real time to acquire the content of plaintiff's and the class members' electronic communications, including their viewing habits and identifying information as described above.

And, again, paragraph 168: [As read] The contents intercepted include information -- you could easily substitute the word "data" there -- concerning the substance -- or meaning of that communication including but not limited to viewing histories and preferences, IP addresses, MAC addresses, ZIP codes, product model numbers, hardware and software versions, chipset IDs, and region and language settings.

Ms. Weaver, isn't that the information or the data that you're looking?

MS. WEAVER: Yes, Your Honor.

THE COURT: Okay.

MS. WEAVER: And one caveat too is you mentioned paragraph 44. It's the defendant's tracking software captures information about a selection of pixels on the screen.

THE COURT: Right.

MS. WEAVER: And what we're trying to get is we have step -- we have a lot of step 2, the analysis. But we have zero of what's on the screen before the collection happens.

THE COURT: Okay. That should be what you guys should be talking about. I don't know what -- I'm really at a loss -- I have to be honest with you. I'm at a loss here for both sides, both sides --

MR. SPERLING: Your Honor.

THE COURT: We're going to talk about the special master. We're going to talk about mediation.

Go ahead, Mr. Sperling.

MR. SPERLING: So --

THE COURT: I'm sorry to interrupt you. One last thing.

MR. SPERLING: Please.

THE COURT: There is no dispute that you collect this information.

The dispute, as I understand it, is the consent; right?

MR. SPERLING: So, Your Honor, when you say "this information," that's the whole issue.

So plaintiff's enumerated paragraph first in their letter of yesterday, their portion of the joint letter, we saw that for that -- that assertion that what SEA's described

the "fingerprint data" is not, in fact, realtime data. That's an assertion -- hold on, Your Honor. This is really important to understanding this. I think it's going to help the Court.

That's an assertion we saw for the first time at 3:00 P.M. yesterday. And we heard it explained to us for the first time in Your Honor's courtroom this morning.

We never heard that before. It is a brand-new theory that they are offering.

Now, okay, everything we've discussed in front of -- until now, as the Court well knows, has resolved around the fingerprint data, and plaintiff's counsel has walked in and said, "oh. There's something else that's not the fingerprint data."

What I would like to propose to do, Your Honor, is to take two exhibits that have been documents that have been produced in this case that plaintiff's counsel used to examine our 30(b)(6) witness, and I would like to walk through with the Court and with plaintiff's counsel for four to five minutes the flow of what happens on the television, as testified to by the witness and as set forth in the sworn, verified interrogatory response -- because the Court is very understandably struggling, as anyone would be, with trying to understand what all this terminology means and what people are referring to because it's in the abstract and not in the

context of a process.

And what I can describe to the Court in line with everything the Court just read from the complaint -- okay? -- is the detailed technological process, as set forth in visual flowcharts and as described by the sworn testimony as to what happens.

And once the Court sees it, I think the Court will understand the terminology and the Court will understand that we have given everything there is to give. There is nothing else.

And to jump to the end, what was -- what plaintiff's counsel's actually asking for now is for us to collect and give them something that we never collect. We don't have it. They want what's displayed on the screen.

What I'm prepared to show the Court, what they heard last week, what they've seen in documents is that the technology goes and it looks at pixels, and it says, as to a particular region on the screen, as to each pixel in that region, what is the relative brightness of this pixel as compared to the surrounding pixels? And then it runs an algorithm, and on the basis of that, it assigns a binary number.

THE COURT: Okay. You're getting into the stuff I don't want to get into now.

MR. SPERLING: So --

THE COURT: Hold on a minute.

MR. SPERLING: Okay. So, Your Honor, but here's the key thing. That's a software process that happens on the television. And then there's an output, and the output is the only thing that SEC -- SAE doesn't get it. SEC gets an output, which is a fingerprint.

And what Ms. Weaver says now is "I'm not satisfied with the output. I want something earlier in time."

Earlier in time is just what the software performs on the TV. Anything earlier in time is happening on their client's television with no participation by us and no collection from us.

I can't give them what's on their client's television. I can't give them, as Ms. Weaver asked me this morning, "What's on the televisions of 81 million purported class members" -- or putative class members. We don't have it. We never get it. Not SEA. Not SEC.

THE COURT: Okay. Here's the problem. I have found now, having worked with counsel since -- on these disputes, some get resolved; most don't. Some that do boomerang right back to the Court since September, July of last year. And what I have found on multiple occasions is not only is there -- you don't even -- there's not just the dispute over whether you're entitled to that, whether you have it or not, what is being asked and what the other side

hears you're asking for.

So what I'm trying to understand is -- and I'm, again, the roadmap has to be in part based on the very detailed allegations in the complaint. So that's why I am not interested -- I thought -- I could allow the parties -- because you're all much more experienced with this than I am.

I didn't bring the lawsuit. I am not defending the lawsuit.

So I presume that when a lawyer brings a lawsuit, they know what they're talking about. When the lawyer defends a lawsuit, they know what they're talking about. So I relied on the parties to use these -- what I'll call "terms of art": Fingerprint data -- I'm a former prosecutor. Fingerprint data to me means something very different than what we're talking about. So I trusted the parties to explain that was something you both understood so I could put in an order, have a meet-and-confer, produce it, if you have it. If you don't have it or you don't understand what's being sought, talk to each other.

"Realtime data" was another phrase that was being used.

"Matching database."

And what I've learned is we are not making any progress. We are going backwards.

So I'm trying to figure out -- because you clearly

need Court intervention at every step of the way. You shouldn't need it, but for some reason, you still do. The case is seven years old. I have 400 cases. And I can't have you in every week. And it has nothing to do with the fact that you're flying in or you're local. I would have you in every day. And I'm canceling next week because it's not going to be productive for the Court. Clearly not going to be productive for the parties.

And so I'm trying to find another way to help the plaintiffs get information to allow them to try and prove their claims but in a proportional way that's not going to be unduly burdensome for this defendant.

And if the answer is this defendant doesn't -- we understand what the plaintiff is asking for. We don't have it. We don't collect it or SEC has it or whatever.

But I can't even zero in on those responses because you're not even agreeing on what is being asked.

She says you're hiding the ball, and you say you're moving the ball.

I don't know what to say anymore.

So I'm trying to find a way to resolve this.

I go back to the complaint. And the complaint says, this -- this -- these are the types of information, data, that the defense has allegedly intercepted, collected, and now uses for some profit.

So my question is, you're saying that this information that's alleged in your complaint has not been -- these categories haven't been given? Because he made a point, he said, you want what's on the screen?

MS. WEAVER: So, Your Honor, may I respond?

THE COURT: Yes.

MS. WEAVER: Okay. So there's two different -- there's the interception claim, and there's the use claim. And the use claim relates to fingerprinting and the matching database and how they are using it and how they're taking the data and matching with data they get from data brokers to create profiles.

We got testimony of that.

THE COURT: -- that.

MS. WEAVER: We have a lot of it.

Let me put a button just on time period.

So we have for 2019 forward, we got testimony last week. We have some data. We feel good about that. I need to analyze it. We just took three 30(b)(6) deps last week. And so we're still looking at it, and we have to have experts. But I feel pretty good about that.

This is what the witness said -- I've just got some quotes from the rough transcript. I don't think we even have -- he said -- he was describing fingerprinting after the data appears on the screen.

THE COURT: Look -- hold on a minute. I can't keep using this word "fingerprint."

MS. WEAVER: Okay.

THE COURT: It's not helpful to me.

I want to go back again and --

MS. WEAVER: Yeah.

THE COURT: -- if you want to talk to me about the testimony from the witness, you have to talk to me in terms of what it is that you're saying you've asked for either --

MS. WEAVER: Yes.

THE COURT: -- in the deposition and he didn't respond or in a request and they haven't given it to you or responded to it --

MS. WEAVER: Right.

THE COURT: -- as it relates to the data that you are saying they collected.

Remember, it's all -- your whole case is about what data you're saying the defendant's unlawfully intercepted.

MS. WEAVER: Right.

THE COURT: And you describe in detail this data.

MS. WEAVER: Exactly.

THE COURT: So are you saying -- for example --

MS. WEAVER: If Your Honor could --

THE COURT: -- the viewing histories, the personal preferences, the contents of conversation, all the -- are you

saying that stuff that they were not party to that communication, you're saying --

MS. WEAVER: Exactly, Your Honor.

THE COURT: -- right -- it's between -- I get it. I understand now the case. I've spent so much time understanding this case, and I don't understand why there's still these issues about --

MS. WEAVER: It's about --

THE COURT: -- you either have it, or you have it, or you don't.

And so if -- like I said, if at the end of the day -- and, look, there's a whole separate problem, I think, about this fingerprint data and you're having trouble collecting it because it gets discarded quickly, and maybe you need to figure out a date for some future collection. I don't know. That's a different issue, which you really should be able to work out.

But in terms of you're saying they haven't given us the realtime data, the fingerprint data, what is it --

MS. WEAVER: Okay.

THE COURT: -- they haven't given you?

MS. WEAVER: Let me try giving you these three snippets from the deposition, and I will use the word "fingerprint," and I don't want to upset the Court, but I want to try to explain what's going on.

For the interception, we have --

THE COURT: The communication that they're not party to.

MS. WEAVER: Right.

THE COURT: You're saying between your TV and the history -- services.

MS. WEAVER: No, no. Hear me out, Your Honor. Please let me just explain why it's important.

For the interception, there's a contemporaneous requirement. And so what Samsung, I believe, the defendant is trying to do is only give us post-interception data and then say, "We never intercepted it, and, anyway, we don't have the data as it comes in." So you can't prove interception.

And my use claim is based on interception.

So what is appearing on the screen is what this witness said is glass.

THE COURT: Is what?

MS. WEAVER: And he testified --

THE COURT: -- word did you say? Is what?

MS. WEAVER: Glass, g-l-a-s-s.

The glass is the output of the TV in visual form. That is I, the consumer, have Netflix on. It sends something through the cable, and that appears on my screen.

The interception needs to happen contemporaneously

like that -- the case law says within a second or so.

But what I need to know to show to the jury is what shows up on the glass.

And so I said, "And so a fingerprint is different than glass. Right?"

He said, "Yes. Fingerprint data is the data being generated by ACR," which is the analysis of what appears.

So for me to show the interception claim, it's like saying a letter was intercepted but they're not going to give me the letter. And they're going to say, oh, all you get over here is after we opened the letter and wrote about it.

But I need the letter or some representation of it. And I think maybe my opposing counsel gave us a clue. There's software which will reveal there will be -- and I don't have to have it -- you know, again, it can be representative. There is software that will show what -- how the -- what is being shown on glass.

And until last week, I did not have this testimony. And we, ourselves, if you look at our last letter -- not this letter, Your Honor, but the previous one where we said our understanding was that fingerprint was the unanalyzed realtime data, I learned in this deposition last Monday, it's not; that it is something called "glass."

And so even the diagram that opposing counsel was going to show you will have this representation on it. And I

asked in this dataflow, the diagram is all the fingerprinting process.

And I said, "Okay. What happens -- like what is being fingerprinted? What is the analysis?"

And then the witness said, "That is glass." That's this testimony.

And it appears prior to this -- actually, he -- he contradicted himself about when that comes in.

And that is the issue.

THE COURT: What do you mean? When what comes in?

MS. WEAVER: So he contradicted himself. I showed him this diagram and said, "Where does glass appear?"

THE COURT: Whose diagram?

MS. WEAVER: This is the Exhibit 6 to the deposition that I believe Mr. Sperling was talking about.

And the witness said --

THE COURT: Whose diagram is it, though? Is it --

MS. WEAVER: Samsung's.

THE COURT: -- their document.

MS. WEAVER: Yes, it's their document that they produced.

And I said, "What does glass appear on this diagram?"

And he first said, "It's after the ACR process begins."

And then counsel asked for a break. And he consulted with the lawyers, and he came back and said, "No. I was wrong. The lawyers reminded me that I met with these SEC engineers, and glass appears before then."

So this was testimony contradicting --

THE COURT: Appears before the data is collected?

MS. WEAVER: What exactly. That's -- of course, it can't appear before the data's collected.

I just need the evidence to show when glass appears.

And all they are giving me is --

THE COURT: Wait, wait, wait.

What do you mean -- you said -- you're saying he testified that that glass appears before the data --

MS. WEAVER: Before the fingerprinting starts. Yeah.

THE COURT: Before they -- when you say "fingerprinting," right, it's the --

MS. WEAVER: The analysis. Right.

And the question is --

THE COURT: Or tracking or whatever.

MS. WEAVER: I believe that what they are going to contend is that for there to be an interception, ACR has to start running before glass appears -- which doesn't make any sense to me. I don't think it's right on the law. But that

is what they have said.

And so I need to know what is timing between what appears on the user's television screen, glass, and then what is it that they are then analyzing through ACR?

THE COURT: So it's your contention that they are monitoring what's on the consumer's screen --

MS. WEAVER: Yes.

THE COURT: -- before they actually do anything with that data?

MS. WEAVER: No. The contention is as soon as it arrives, they begin --

THE COURT: What -- you can't use pronouns. As soon as what arrives?

MS. WEAVER: I'm sorry.

As soon as the image arrives on a consumer's screen, twice a second, they are using what they call "pixels," which is really another way of saying "taking a photograph"; right? A digital representation as light and dark. They have taking a photograph twice a second of what is on the user's screen.

And I'm just asking for samples of what is on the user's screen.

And they are only giving me their analysis of it.

So I need some kind of representation of -- to show the interception of what is actually appearing on the screen

or how it does it; it could be a description, or it could be testimony.

THE COURT: But doesn't it depend on whether or not they are taking snapshots of the screen?

MS. WEAVER: They are. That's uncontested. That is how ACR operates.

THE COURT: It's uncontested?

Is that uncontested?

Just that one part. So that uncontested?

MS. WEAVER: He won't say snapshots.

MR. SPERLING: My co-counsel was whispering. Just for the last second, I didn't hear the last comments, so I don't know if, Your Honor, what you're asking me is uncontested.

THE COURT: Is it uncontested that Samsung takes snapshots of what's on the screen?

MR. SPERLING: Of course, it's contested. We don't take a snapshot.

MS. WEAVER: He doesn't --

THE COURT: What do you take, then?

MR. SPERLING: Your Honor, can I walk you through it -- so --

THE COURT: You tell me, what do you take?

MR. SPERLING: So, Your Honor --

THE COURT: If they're not called snapshots,

they're called the something else.

MR. SPERLING: There is -- here's what happens.

THE COURT: All right. Just don't -- this is where we are. This is the problem. I am not -- wait. I am not having an evidentiary hearing. I am not listening to testimony from experts.

So she says black, and you say white.

MR. SPERLING: Your Honor, I can really explain it --

(Simultaneous conversation)

MS. WEAVER: I think if you asked --

(Simultaneous conversation)

MS. WEAVER: -- does ACR collect data twice a second, he would have to say yes.

He just -- doesn't think it's a snapshot.

THE COURT: Yeah, but.

MR. SPERLING: Your Honor, we --

(Simultaneous conversation)

THE COURT: But there are two -- there are two communication -- there are two communications; right? One that you're party to and one that allegedly you're not party to. Right?

And it's the one that you're allegedly not party to.

MR. SPERLING: Your Honor --

THE COURT: Go ahead, Mr. Sperling --

MR. SPERLING: Your Honor --

(Simultaneous conversation)

THE COURT: And I'll -- look, just so you all know, we're done at 3:30 because I have other conferences. But we'll be done with this in 10 minutes, this particular issue.

MR. SPERLING: Your Honor, the TV -- and I know this is shocking to plaintiffs, the TV shows an image on the screen. Okay?

Let me step back and then answer the Court's question -- because this is important. Okay? We've been insisting, encouraging, urging them to take depositions for months.

They waited until now.

And what happened is at a deposition, they finally learned how this works. Okay? And they are scrambling because it's clearly not an interception. They are scrambling and restating their theory. Articulated to us for the first time this morning, they have a brand-new theory of the case, and now she wants to propound brand-new discovery requests.

Your Honor said on March 14th, discovery is closed with the exception of these enumerated things that go until --

THE COURT: I know what I --

MR. SPERLING: -- May 31st.

It is a brand-new theory.

Here's what happens on the television. The television displays an image because that's what you want a TV to do, and that's not called interception. When the TV displays the image the TV's supposed to display, it's not interception.

THE COURT: Well, wait a second. That's a legal conclusion.

So walk me through -- both sides. Right?

MR. SPERLING: Well --

THE COURT: So, wait, I'm a consumer.

MR. SPERLING: Yeah.

THE COURT: I want to watch Hulu.

MR. SPERLING: Yeah.

THE COURT: I want to watch -- I don't know -- I think "Only Murders in the Building." I think that's on Hulu -- because I do watch that. I cue that up.

MR. SPERLING: And it's on your screen.

THE COURT: It's on my screen.

MR. SPERLING: Wiretapping, Your Honor?

THE COURT: Well, I am not making that legal conclusion one way or the other.

I want to know are you monitoring that?

MR. SPERLING: No, you're not, Your Honor -- no,

we're not, Your Honor.

Here's what we're doing. Okay?

THE COURT: So that -- so that comes up on my screen --

(Simultaneous conversation)

MR. SPERLING: -- so the television, okay, the television --

THE COURT: That has the ACR technology.

MR. SPERLING: That has the ACR technology, that ACR technology looks at the pixels on the screen, the glass. Okay?

THE COURT: I'm sorry. Is glass and pixel synonymous?

MR. SPERLING: Glass is, Your Honor, and I know this won't come out on the transcript, I'm pointing to the screen of my phone. That's the glass, the screen.

THE COURT: Okay.

MR. SPERLING: It looks at the pixels on the screen.

And what it does is it --

THE COURT: "It" meaning the technology?

MR. SPERLING: The technology, Your Honor.

And as the witness testified, it reduces it to a black-and-white matrix, and it assigns, the technology assigns to each pixel in which in a designated region of

interest -- that just means a portion of the screen -- there are five different regions of interest. It assigns a value, a numerical value -- okay? -- for brightness to each pixel.

And then the algorithm says, as to each pixel in the region of interest, okay, what is the relative brightness of that pixel in a three-by-three matrix? So there's a central pixel, like a tic-tac-toe box. And I look at all the surrounding pixels. So there's three on the top, three on the bottom, and one on each side of the one in the center. Right? And are they sufficiently lighter or sufficiently darker than the pixel I'm analyzing.

Based on that, each surrounding pixel is given a value of a 0 or a 1. A unique binary code is created. All of is happening on the television, Your Honor.

That code, it's generated for every pixel in the region of interest. And the output of that is a hash value or what we've been calling a "fingerprint." A binary numerical representation based on the relative brightness darkness of each pixel on the screen.

All of that is performed on the television. That fingerprint is generated twice a second. So within one minute, there are 120 -- that are generated. And the last three in each minute, two a second, means 120 in a minute, the last three that are generated in a minute get transmitted to the matching server to see if they match a hash -- also

called a fingerprint, a so-called reference data. So you create a fingerprint of what's on the screen, and in the matching database, there are fingerprints of content -- right? -- that search a reference to say do these things -- are these things a match?

And that's why one of the reasons why the "fingerprint" has become so confusing because you have to know, are you talking about the fingerprint generated on the television? Are you talking about the fingerprint maintained in the matching database for purposes of seeing whether those two printers match?

But back to the television, Your Honor.

Everything that she's described in the glass happens on the TV. Okay?

SEA and SEC are not doing that except insofar as somebody manufactured the television. And that's one of the functions that happens on the television.

The only thing that gets communicated out from the television to SEC is the fingerprint.

So what happened last week is counsel discovered that contrary to the -- belief, nobody's taking an image off the screen.

What's being communicated is a binary representation of the relative brightness and darkness of certain pixels on the screen.

And counsel doesn't like that for her case. So counsel instead would like to back up in time because --

THE COURT: Go back to what you said about pixels on the screen.

MR. SPERLING: Sure, Your Honor. And it would be a lot easier with the diagram, Your Honor.

There's a region of interest designated on the screen. It's just a portion. That's what "region of interest" means. It's a portion of the screen.

THE COURT: When you say "designated" or whatever --

MR. SPERLING: Yeah.

THE COURT: -- the allegation in the complaint -- and it's important because Judge Arleo wrote -- oh, I don't know, three or four, five opinions on this case already. And I've reviewed them all.

And she says -- this is coming from her opinion of August 21st, 2019, Docket Entry Number 104: [As read] Plaintiffs allege, quote, that defendants obtained more than static identifiers and are able to track what SmartTV viewers are watching by capturing, quote, information about a selection of pixels on the screen.

That's paragraph 44.

[As read] This is plainly, quote, information concerning the substance -- or meaning of the relevant

communication between the meaning of the Wiretap Act.

I am not saying whether -- this is a pleading stage -- a decision.

MR. SPERLING: Yes.

THE COURT: But my question for you is whatever you're doing, meaning Samsung, is doing with the pixels -- and for whatever purpose under 120 -- you take the three -- that's -- isn't that what she's asking about?

MR. SPERLING: So, Your Honor, she may be asking about that now, but the point is we don't collect that. We don't have that.

That is a function happening on the television in the same way that when Your Honor watched the program that I am not familiar with -- so I apologize; I don't remember the name -- okay -- the television displays that on the pixels that constitute the screen. That's just something that happens on the television.

So --

THE COURT: So when does the -- I don't mean to -- I know it's her word, not your word -- "snapshot" every two seconds.

MR. SPERLING: So every half a second, twice a second.

THE COURT: Twice a second.

MR. SPERLING: The ACR technology is looking at the

some of the pixels and saying on a black-and-white basis --

THE COURT: After they appear on the screen.

MR. SPERLING: After they appear on the screen.

THE COURT: Then the technology is looking at those pixels.

MR. SPERLING: The technology looks at the pixels after they appear on the screen. They are on the screen. The technology looks at it, and the technology says for a certain group of pixels, okay, as to each pixel within that group, what is the brightness of that pixel --

THE COURT: Right.

MR. SPERLING: -- relative to the brightness of the surrounding pixels -- not is it --

THE COURT: I got it. And --

(Simultaneous conversation)

MR. SPERLING: -- not is it orange, purple, red --

THE COURT: I want to talk about when the technology comes into the picture --

MR. SPERLING: It displays --

THE COURT: So it's --

MR. SPERLING: It displays on the screen --

THE COURT: Right.

MR. SPERLING: -- then the technology goes to work. That's all happening on the television in the same way that the display of the image in the first place is something that

happens on the television. Okay.

The only output that leaves the user's television is the fingerprint. That is the output that goes from the television to the matching database. The fingerprint. Nothing else is taken.

So now plaintiff's counsel has said to us this morning, "But I want the earlier thing. I want what you capture in terms of the pixels."

We don't capture that, Your Honor. That's going on on the user's television.

THE COURT: Okay.

MR. SPERLING: We have no output.

I cannot give her what is going on on her client's television. Her client could. Her client could take his phone or a camera, if he still has such a thing, and he could take a picture of what's on his screen. And then they would have the pixels.

But I can't do that.

THE COURT: I got it. Okay. Thank you for -- I do appreciate you explaining that to me.

So, Ms. Weaver, I understand now what you're asking for. And I understand -- his position is I understand what you're asking for too.

Put aside whether or not it's established as an interception. I am not here to rule on that.

And query whether he says it's a new request. I'm going to -- that. I want to move this case.

He said, you know, that's not the kind of stuff that the technology captures, the pixels.

So what do we do?

MS. WEAVER: It's capturing something, or it wouldn't be transmitting the information about what you're watching.

So this is like --

THE COURT: No, but wait a minute. Wait a minute.

MS. WEAVER: -- this is parsing it --

THE COURT: Wait a minute.

MS. WEAVER: Yeah that.

THE COURT: You are right. I don't think he's disagree -- he said it. He goes, yeah. He's like, it is.

But you're asking for, I guess, the pixels on the screen; right?

MS. WEAVER: Okay. This is what I'm asking for.

THE COURT: Yeah.

MS. WEAVER: And please bear with me, Your Honor. I want to talk a little bit about timing because that's why it's important.

THE COURT: You've got a little bit. It's 3:00 o'clock.

MS. WEAVER: Okay. I understand. We came into

this deposition --

THE COURT: Because, by the way, I can't say enough, how many meet-and-confers I've asked you to do, and I'm sitting here as referee trying to --

MS. WEAVER: I've met and conferred and I -- you know, Your Honor, this isn't the first time that we've had these discussions, obviously.

But let me just say, I came into the deposition: "Do you have any understanding as the time period for which you are prepared to testify today?

"ANSWER: I could not cover any topics prior to me joining Samsung.

"QUESTION: So you are unable to testify on any of these topics prior to October 2019. Is that right?

"ANSWER: Correct."

Lower down, I say: "To prepare for your deposition today, did you take any steps to inform yourself about SEA's ACR data collection prior to October 2019.

"Not prior October 2019, no."

THE COURT: But your point is that, perhaps --

MS. WEAVER: Wait --

THE COURT: -- doing this what you're looking for before 2019.

MS. WEAVER: Wait. So, exactly, and so Exhibit --

THE COURT: We'll get to that --

MS. WEAVER: No, hang on. No, but let me explain what worked.

So for Exhibit 6, they had a -- of dataflow. I had a diagram. I said to the witness: "Where is glass?"

And he says, "It's" --

THE COURT: It's this. It's the glass --

(Simultaneous conversation)

MS. WEAVER: It's -- no, no. Where is the glass -- the image that's appearing on the screen that the ACR is drawing, I would say, a digital photograph of -- you can make it sound complicated, but all they're doing is digitizing an image.

THE COURT: Okay. Stop there.

Are you digitizing an image?

MR. SPERLING: Digitizing an image. I don't know what that means, Your Honor.

THE COURT: What does it mean?

MS. WEAVER: It means that on page 3 of this same exhibit, it describes -- and there's a photo with an arrow that goes to this binary code thing that -- you know, can sound very complicated. It is translating that photo into binary code and then sending it out to Samsung so it can match --

THE COURT: Got it. I know that part, the second -- we all know what ends up happening.

MS. WEAVER: Got it.

THE COURT: That's what she's saying. That's what it means.

MR. SPERLING: What that document describes is what I said, Your Honor. What it does is it looks at the relative brightness of certain pixels. It does assign them a value. So if that's what she means by "digitization," there are digits associated with that.

But it is not a digitization of an image. And a key fact, okay, which came out in the testimony is the fingerprint that's generated, okay -- sometimes called a hash; sometimes called a fingerprint -- you cannot reverse an image -- reverse-engineer the -- of fingerprint. There's no way to look at the fingerprint and say, let me run it in reverse and know what the image was.

So in that respect, it is definitely not a digitization of an image.

THE COURT: So is it collecting the images? It is collecting data --

(Simultaneous conversation)

MS. WEAVER: -- off the screen using this binary code.

And that is what I'm saying. We've been kind of railroaded into only getting the analysis that's happening later.

And what I need is what is actually being captured.

And the testimony I got from somebody with October 2019 forward was looking at a diagram that said he looked at it and testified, "Glass happens immediately before."

And so I either --

THE COURT: Either before what?

MS. WEAVER: -- the entire fingerprinting process.

But he actually equivocated. He gave testimony one way. Then he came back and said, "No, it happens the other way," after literally he testified that he talked to the lawyers during the break in the deposition and came back and said, "No. It happens another way."

I want somebody with personal knowledge of the dataflow who can describe it for the relevant time period. We could use a diagram like that. Also snippets of code can give an example of how the data actually appears and is delivered. There were all kinds of design documents there are manuals. There are a lot of ways to skin the cat.

But I've just been denied all evidence.

And to tell me to go take a photo of my client's screen, that doesn't reveal the interception. I mean --

(Simultaneous conversation)

THE COURT: --

MS. WEAVER: Yeah.

THE COURT: This is ---or -- based on how you guys

are characterizing what the testimony was of this witness, what you're looking for, what you say she's looking for, what you say you have that is or isn't responsive to what she's looking for.

Are you saying that you have this witness, 30(b)(6) witness's testimony for 2019 to the present. It is what it is. But you want a witness who's going to be able to testify from 2014 to 2019?

MS. WEAVER: I'm -- he was on the road to it of orally describing where glass appears and how close in proximity to the time of fingerprinting. So I need the sequence of events. I mean, essentially --

THE COURT: Sorry -- I don't know if you are understanding my question.

MS. WEAVER: I'm sorry.

THE COURT: -- asking it the right way.

You kept saying -- you know, you started this whole thing by saying, "He was only able to really testify about 2019 to the present."

MS. WEAVER: That's true. So I do need the time period before, for sure.

And then what do I need for the entire time period?

THE COURT: Still not understanding it. I am not understanding it. I am not understanding either one of you, quite frankly -- because you are telling me -- now if he

equivocated, that's a different problem.

MS. WEAVER: He equivocated.

THE COURT: You guys can -- and you know what? If this case ends up going to trial, you guys can deal with that. It is what it is. He testified.

MS. WEAVER: Right.

THE COURT: He's stuck with the testimony.

MS. WEAVER: Right.

THE COURT: That's it.

This -- and -- you want to know -- you want to be able to get a snapshot of what they capture on the screen before they collect it and analyze it.

MS. WEAVER: Well -- yeah, I want to know what exactly they're analyzing. Like some sample of what is the ACR operating on and my expert can explain sort of the sequence.

But I can't --

(Simultaneous conversation)

THE COURT: Well --

(Simultaneous conversation)

MS. WEAVER: We need to look at the data to understand --

THE COURT: No, no. Listen. Listen.

First, we were talking about what's on the screen, what's on the screen --

MS. WEAVER: Right.

THE COURT: -- and you're like, well, I need to know what they're analyzing.

I'm trying to work with both sides to cut through this, if I have to, do a modified request to say, "Answer this question."

And I still don't know how to help you wordsmith the request.

So if you want, you've got to tell me exactly what it is. You can't just say what they analyzed because then we are right back to the second amended complaint, all this data you're saying they collected, they captured, and they analyzed. And you already -- you already know what they've done with the stuff they've analyzed.

You want to know what information they've taken?

MS. WEAVER: If they are making a challenge to the contemporaneousness of how the interception happens. I mean, what is obvious from a thousand feet is somehow what's on your screen is ending up in the advertiser's --

(Simultaneous conversation)

THE COURT: What -- so you want to know what they're capturing on the screen?

MS. WEAVER: How. Yes. How -- yes. What and how. Not the what and how of the fingerprinting process, but the what and how of the interception.

THE COURT: -- you have to stop using legal words, and you have stop using legal words.
MS. WEAVER: Okay. Apologies.
THE COURT: So you need to prove they intercepted. And they're going to say, "We didn't."
MS. WEAVER: Right.
THE COURT: That will be either for Judge Arleo to decide on summary judgment or for a jury to decide.
MS. WEAVER: Right.
THE COURT: So tell me once again what are you asking them to --
MS. WEAVER: What is the data that appears? And how do they --
THE COURT: Let's be specific. The data that appears --
MS. WEAVER: Okay. I order a movie on Hulu, a TV series. It comes through the television and appears on my screen.
I need the process of what appears on my screen and what happens next.
THE COURT: Okay. Now, let's stop -- because I heard him say it but I know he's going to say it again: They're not involved with that process.
Is that what you're going to say?
MR. SPERLING: We're not involved in that process,

Your Honor.

THE COURT: That is -- I'm just saying --

(Simultaneous conversation)

MS. WEAVER: Okay. But let me -- let me --

(Simultaneous conversation)

THE COURT: So maybe --

(Simultaneous conversation)

MS. WEAVER: They met with two -- or three people from SEC to prepare for this deposition.

THE COURT: Okay.

MS. WEAVER: And then they cherry-picked, we'll give you only this but we won't give you that.

THE COURT: Tell me what they said they won't give.

MS. WEAVER: They will not -- he could only testify about the fingerprinting process. He can't testify -- so it's their --

THE COURT: Why did he say he couldn't testify?

MS. WEAVER: Because he didn't -- I -- he -- he doesn't have the knowledge because SEC knows that.

But he met with SEC to get the last --

(Simultaneous conversation)

THE COURT: Okay --

(Simultaneous conversation)

MS. WEAVER: -- he didn't get from SEC the first --

(Simultaneous conversation)

THE COURT: And I'll hear from Mr. Sperling, but that may be a different issue. Maybe that's a question, then, for SEC.

MS. WEAVER: Well, the issue is how come they can pick and choose and deliver only the part of the evidence that helps SEA's case, meeting with these engineers --

(Simultaneous conversation)

THE COURT: I don't think -- you should be able to drill down on that.

The question is whether or not they have --

(Simultaneous conversation)

MS. WEAVER: Possession, custody, or control --

(Simultaneous conversation)

THE COURT: Well, one second. One second.

MS. WEAVER: I'm sorry.

THE COURT: It's one thing for the witness to say, "I understand you want me to testify about this topic, about once something is -- appears on the screen, how or if SEA goes about capturing that and then takes that information and then analyzes it."

If the answer is, "Oh, the particular person that SEC has produced is just not knowledgeable, "I'll order them to produce somebody else.

If they say nobody at SEA is knowledgeable because we don't do that, what I am I supposed to do with that?

MS. WEAVER: But they spoke to SEC about the process, and --

(Simultaneous conversation)

THE COURT: Right, but SEC --

(Simultaneous conversation)

MS. WEAVER: -- so they --

(Simultaneous conversation)

THE COURT:

MS. WEAVER: They're playing it both ways --

(Simultaneous conversation)

THE COURT: I know. But then the SEC maybe should be the person.

MS. WEAVER: That could be true too. That's why we're trying to subpoena SEC any way we can.

But here they meet with SEC to get the information when it helps them. And then when I ask the question about the interception --

THE COURT: Right.

MS. WEAVER: -- they say, oh, we don't know that. You would have to go to SEC.

THE COURT: So what -- go ahead.

MR. SPERLING: Your Honor, all of their discovery requests, their deposition topics were about the information collected. Collected. Collected. Collected. Collected.

All of their requests. Okay?

Again, Your Honor, okay, I am not exaggerating. They went into a deposition. They got substantive testimony that was complete but not very good for their case. And they're changing the theory.

In walks plaintiff's counsel to say, the witness, who was designated on topics about what information is collected, couldn't answer my questions about other things that happened before collection. Okay? That's number one.

Number two, I am not even sure what question she's referring to that the witness couldn't answer. I would love to hand up to the Court what was marked as Exhibit Number 6. Okay. At the witness's deposition, this was a 30(b)(6) deposition, an individual deposition of Stewart Farr -- because there's a flowchart that the witness was questioned about, which is the source of this entire discussion. Okay?

I have a copy for plaintiff's counsel. I have a copy for the Court. I think it will make it easier for the Court to understand what we're talking about.

THE COURT: Before you do, what about Ms. Weaver -- I don't -- because, again, as I said before, one of the themes are I decide an issue and -- answering that today. So I was not prepared to have a revisit the 30(b)(6) deposition topics.

Are the topics -- because some I struck and some I allowed.

Were any of them asking about this initial process?

MS. WEAVER: Yeah, I mean, Your Honor -- I'm sorry. But in the vernacular, if you're asking what is collected, if you are asking me what is -- like if there's a basket of information and I'm saying what is collected, I do need to know what the basket is. I mean, this is the interception claim.

So I don't know how to -- they parsed it this way. So I drafted it this way.

But at the bottom, the heart of the case is when does this appear?

THE COURT: I got it.

MR. SPERLING: I mean, Your Honor, now she's saying that what's displayed on the television by the television is collected regardless of whether it ever leaves the television --

THE COURT: No, I don't think that's what she's saying.

MR. SPERLING: Oh, I think it is, Your Honor --

(Simultaneous conversation)

THE COURT: I think she's saying --

(Simultaneous conversation)

THE COURT: She has a point, though.

MR. SPERLING: What is it, Your Honor? Because I am not understanding.

THE COURT: The point is if you produce someone who's going to be able to testify about what's collected and what you -- well, what you do with what's collected, then do you have someone who could testify about how you went about collecting it.

MR. SPERLING: But he did, Your Honor --

(Simultaneous conversation)

MR. SPERLING: That's I why said, Your Honor, I don't know what --

(Simultaneous conversation)

THE COURT: So she has to read a 200-and-something deposition transcript to see who's right, whether the light was red or whether the light was green? Because that's what it sounds like.

MR. SPERLING: Not what I'm proposing, Your Honor. But I am not aware -- and she's not identified a question that he couldn't answer. Okay.

I would really love if the Court would indulge it, hand up --

THE COURT: Hand it up.

What is this that's been handed up to me?

MR. SPERLING: Your Honor, what's been handed up is a document bearing Bates Numbers SEA 05 -- 045606 to 045610.

THE COURT: This was something kept in the ordinary course of business? Or this was something prepared for the

purposes of the 30(b)(6) deposition?

MR. SPERLING: Your Honor, this was obtained upon request to SEC. My understanding is that it was maintained in the ordinary course of business as SEC. I cannot personally vouch for that. It was marked as Exhibit Number 8 at the Stewart Farr deposition.

If the Court turns to the page with the Bates number ending in 608, so beginning in the upper left, Your Honor, where it says "preprocessing," what the witness testified is that what you see below, there's an image. That's a screen. Okay?

THE COURT: The frame.

MR. SPERLING: The frame. So you see below that, there's an image. Okay.

So the software captures a frame. The software removes the border of that image.

THE COURT: Software -- software, you mean what? The ACR?

MR. SPERLING: The ACR technology operating on the television.

THE COURT: Okay.

MR. SPERLING: This is all happening on the television. It removes the border. It gets an area in the center called "central area."

Then this ACR technology is what's used to generate

a fingerprint regardless of whether it's operating on the television or that the software is being used to generate the reference data fingerprints that are maintained on the matching server.

So you see there's a query there, "Is server?" Okay? That's the software asking itself. Are you the --

THE COURT: Where are you looking for serve -- oh, is the server --

MR. SPERLING: Is server.

THE COURT: The central area --

(Simultaneous conversation)

MR. SPERLING: So that's the software asking itself, "Hey, are you the server that's generating a fingerprint for the reference data? Or are you residing on the television?" Okay?

If the answer is no -- and that's what we're focused on here -- it's not server, it's operating on the television, you go down. Okay.

And it gets multiple ROIs or regions of interest. Those are depicted on the next page, ending in the Bates number 609, essentially, depending on different TVs can have different aspect ratios, Your Honor, and so the software doesn't know the aspect ratio of the TV. So it looks at a few different regions. Okay?

It captures that region. It resizes it to a normal

size. And you see on the far right, there's set ROI.

Once it's resized to a normal size, the flowchart continues.

Here's what's called color-space conversion. That is the reduction to black and white.

Then there is feature extraction, which is described in greater detail on the next page.

But that is the process of generating what's described there as the local binary pattern. That results in binary coding. And at the end result, you have a fingerprint, and it's that fingerprint and only that fingerprint that is sent from the television to SEC.

If Your Honor turns two pages forward to the page ending in 610, there is a description of how that local binary pattern works. And Your Honor will see in the bottom in the green border, there are three blue tic-tac-toe boxes.

Each box has a numerical value, which is brightness value. The focus at any given time is on calculating things for the center box, which is that one is indicated in red. Its value happens to be 54.

To the right of that, the green arrow is an algorithm. It's going to look at each of the surrounding boxes and say, "Is this -- is the adjacent box greater than the value of the pixel in question, the center pixel, whose value is 54 plus T, which is in this case is 5."

So if the greater -- the value is great than 54 plus 5, i.e., greater than 59, then the adjacent pixel will be ascribed a value of 1. If the surrounding -- the adjacent pixel has a value that is 59 or less, it will be assigned a value of 0.

And so what you see in the next blue box are 1s and 0s based on that.

Those 1s and 0s are then put in a sequence in the order indicated by the directional red arrow. That yields the value in the green arrow to the right: 11000, et cetera.

And in that -- excuse me -- that binary number is converted into a decimal value, which is assigned to the center pixel so it no longer has the brightness value of 54. Now it has a value of 192. That value of 192 is the output of this algorithmic process concerning the relative brightness.

That's done for all the pixels in the region of interest.

You get a fingerprint as shown in the page ending in 45609, which is the first page we were looking at. And that fingerprint is what leaves the television.

And what Ms. Weaver seems to be asking is about the beginning of the process, what is going on when the software looks at the glass.

That's a software feature. We don't -- we don't

capture that. It's something the software looks at in the course of generating the thing that is sent to SEC.

So I do not understand what she would like from us.

But what I do understand is that up until now, she wanted what was -- what came off of the television. And now, since what comes off in the television sure ain't an image and she got testimony that you can't reverse-engineer an image from what comes off of the television, from the fingerprint, now she wants to back it up and say, "Now my inquiry is about what's going on on the glass."

Whatever's going on on the glass is the TV displaying what the TV displays.

We don't take that. And there's no significance to the fact that the complaint alleges that we do because that's just an allegation. And, in fact, when Mr. McDonald deposed plaintiff yesterday -- okay? -- he asked plaintiff -- okay? -- what information does he think is being taken from him, from his TV?

And he testified the purpose of the litigation is to find out what's being taken and for what purpose. Okay?

So this was an inquisitive venture by plaintiff's counsel. They got the answer from the witness. The witness testified in detail. They have a detailed document telling them how it works.

And now they want to start anew with a new theory

and a new request focusing on something that they never asked about before. But whatever it is, we don't have it.

THE COURT: All right. I have questions for you, but let me hear from Ms. Weaver first.

MS. WEAVER: Thank you, Your Honor.

So what I asked the witness was -- because this is all the fingerprint process -- I said, "Where does glass appear?" Like, what is the image on the screen?

And he said -- first, his testimony was that it appears after frame here.

And then he came back after the break and says it happens before.

So the issue that we're trying to understand is before the inter -- I mean, everything you've heard described will have legal -- litigation positions. They want to say it's not an interception until they send it away, fine.

Something's been intercepted here about what the user is watching. It's information.

And we're just trying to understand the sequence of events of when that is happening.

So what I'm asking is for the time period for which this witness could not testify, first, is there a process like this that is the same? And, number two, I need more information -- if they're going to object on contemporaneousness of the interception, I need to know more

about -- I need basically this for step one. I need the diagram for step one of how the data comes and is presented on the screen and then when fingerprinting starts. So there's a step -- my expert says there's step one here, and we can't see it because it's happening on the televisions on code encrypted. So somewhere, because they designed these televisions, there's a diagram that also shows how the data comes from the box to the television, appears to the user, and then when ACR starts.

THE COURT: Well, wait a minute. Way a minute. Wait a minute.

They have -- they have consistently throughout this case argued that there is no contemporaneous interception. I mean, I've seen it. I am not saying that's right --

(Simultaneous conversation)

MS. WEAVER: Right. Right. I understand --

(Simultaneous conversation)

THE COURT: That's been their position from day one.

MS. WEAVER: Right.

THE COURT: Your position from day one has been through this ACR -- right? -- they monitor and capture all this data about your clients.

MS. WEAVER: Right.

THE COURT: Okay. So we're not going to restate

people's positions. That's the first thing.

However -- however, Mr. Sperling, you noted that -- here's -- here's where I think, perhaps, the broadness of discovery may be -- there's no dispute that ACR technology is being used. Right? That's the software that's on the television on the Smart TVs. Period.

MR. SPERLING: If the user consents to it, then the ACR technology operates, Your Honor.

THE COURT: Consent or no consent, that's one of the many questions in this case.

I'm just trying to get through a discovery dispute, and I haven't resolved any issue after an hour and 35 minutes.

You said that the ACR technology process begins from step one with this preprocessing stage, this frame; right? The technology looks at the frame and then sets this whole path -- right? -- about centering it with the border removal, it's the server. So if the technology is involved in that step of the process, it must be capturing something.

Is it capturing the frame? What is it capturing?

MR. SPERLING: So, Your Honor --

THE COURT: Because, look, what you -- you told this whole thing that it starts doing --

MR. SPERLING: Yeah, I -- I don't mean to be picayune.

I don't know what the Court means by "capturing." I mean, the software is looking at that for sure.

THE COURT: Okay. It's monitoring it -- whatever word is good for you.

MR. SPERLING: The software looks at it and performs an operation on it, as I tried to describe, walking the Court through this document.

THE COURT: Okay.

MR. SPERLING: The software looks at that.

THE COURT: Got it.

So is that what you're asking about?

MS. WEAVER: We want to know what it's looking at and the timing of it. Yes, Your Honor. We want the dataflow for what happens when it appears and then when the ACR starts operating.

THE COURT: If they -- yeah. That's what they're looking for.

MR. SPERLING: So, Your Honor, they got narrative testimony on how the process works. It sounds like now they're asking for -- I don't know what they're asking for. They're asking for software code?

I mean, Your Honor, it's --

MS. WEAVER: It's a diagram.

MR. SPERLING: The end of discovery's supposed to be March 31st. Your Honor extended it to for a handful of

things --

(Simultaneous conversation)

THE COURT: No, I am not allow -- it's about the deposition. Right. You said you wanted somebody -- right? -- you asked him some questions. He -- look, I said, you guys are -- both of you are stuck with his testimony; right? He explained --

MS. WEAVER: He explained this part.

THE COURT: Yeah.

MS. WEAVER: And he had one teeny piece about when glass appears. But he doesn't have the preceding process and diagram --

(Simultaneous conversation)

THE COURT: Well, wait, wait, wait --

(Simultaneous conversation)

MS. WEAVER: Before the -- so let me explain --

(Simultaneous conversation)

THE COURT: I want to know about when the TV's in the box. It's -- they were talking about --

(Simultaneous conversation)

MS. WEAVER: But, no, right. But we're talking about -- let's use a letter as an example.

THE COURT: No, no, no. Let's not. Let's use what we're talking about.

MS. WEAVER: Okay. Let's use what we're talking

about.

THE COURT: Right? Because this whole --

(Simultaneous conversation)

MS. WEAVER: So what they are --

(Simultaneous conversation)

THE COURT: Wait second. I'm watching Hulu. That's what your allegations are. I -- the consumer is watching something streamlined -- streaming live or not live through the cable provided -- whatever it is, an image comes on the screen. And you're saying the technology then goes to work.

MS. WEAVER: It is extracting information from that image, and then they are processing or doing whatever --

THE COURT: Right.

MS. WEAVER: -- and using it.

And I don't have the part where the image arrives and the processing starts.

I just have this part. The processing starts --

(Simultaneous conversation)

THE COURT: I understand that.

So you are saying when the image arrives. And they said this brief -- I'm looking at this exhibit.

MS. WEAVER: Yes.

THE COURT: This preprocessing, the frame, the image, whatever you want to use, appears on the screen.

MS. WEAVER: Right.

THE COURT: On the glass. Whatever you want to use.

You want to know from that point, what's happening.

MS. WEAVER: No, no, no. So this is exactly right except for this exception: The witness first said the image arrives after frame. Frame is actually the ACR process.

What I don't have, according to his changed testimony is when the image arrives. Like what is it operating on --

THE COURT: What was his changed testimony?

MS. WEAVER: He said first, if you look at the diagram, he said the image arrives after frame.

And then he went back and said --

THE COURT: What do you mean the image arrives after frame? I don't know that --

MS. WEAVER: He said "glass."

THE COURT: What appears on the user's screen.

MS. WEAVER: The screen, arriving after the frame in the diagram here.

I'm just trying to get the sequence of events laid out. And I don't have when the image on the person's screen appears in this diagram. I have the analysis of it, according to his testimony after.

So I just need a diagram that I can show a jury

that says, this is the diagram of you order the thing from Hulu, the data comes into a box. It goes to your television. And then it appears on your screen, and then, boom, ACR goes to work.

All I've got right now is no image on the screen and the part where how ACR works after the image appears.

THE COURT: You -- what's relevant is what part -- at what part does the ACR technology start doing something --

MS. WEAVER: To --

THE COURT: -- monitoring, capturing, reviewing, observing -- we can throw in every synonym that you want.

That's what it's about.

MS. WEAVER: Yup.

THE COURT: Right?

MS. WEAVER: I agree.

THE COURT: He testified, you said. He changed it, but he testified that when the image appears on the screen, then ACR goes to work?

MS. WEAVER: Yeah, it's just not very specific. And, I mean, that's fine. If they're stuck with it, that's what they want, then I don't want to hear a challenge to contemporaneous about how quickly after the image arrives ACR starts working. But I don't have this diagram.

And there is -- they have to possess them because they created the product that does it.

THE COURT: I just want to be clear.

So, Mr. Sperling, her point is if you acknowledge that once the image appears on the screen or this frame appears on the glass or whatever you want to call it in this preprocessing stage, this is when ACR technology starts to do something. It starts to go to work. It starts to look at the images or the frame. It starts to do stuff before you get to the fingerprinting process. Right?

MR. SPERLING: That's what the witness testified to, with Your Honor.

THE COURT: So she's saying it's basically contemporaneous with when the image appears on the screen.

MR. SPERLING: Well, we can litigate that, Your Honor. I don't agree with that at all.

But --

(Simultaneous conversation)

MR. SPERLING: -- yeah, I think we're focused on what information she's asking for.

What is she asking for? It sounds to me -- I'm merely trying to put words around it -- what I thought I just heard was now I want to know everything about how the -- how the image comes to be on the screen in the first instance.

So, Your Honor, it's like we're starting discovery from scratch. Now she wants to take discovery on the operation of the TV, not the operation of the ACR

technology --

THE COURT: Yeah, we're not doing that. We're not doing that.

MR. SPERLING: I'm glad to hear it, Your Honor.

THE COURT: But -- but -- if you're going to say, "Yup, ACR started to do stuff, but it's not contemporaneous," right, so that there's no interception -- and maybe there's a legal argument there somewhere, but what's important is that if you acknowledge, your witness -- and it's not you guys testifying -- right? -- but based on the witness, the 30(b)(6) witness's testimony that the ACR technology starts doing something to whatever you want to call it -- ready itself to start collecting that data, but it starts -- the image -- if that's what happens, again, I bring it up, I bring up my show on Hulu, and at that moment, the ACR technology starts to monitor, starts to gather information that ultimately it's going to collect and analyze, that's what she's entitled to.

MR. SPERLING: But she got that, Your Honor.

THE COURT: So, then, why is there a disagreement -- what's the disagreement about the contemporaneousness? About the contemporaneousness about what you're collecting? You're saying the collection is done contemporaneous with what it's monitoring?

MR. SPERLING: Your Honor, we don't -- we don't

think that we collect any content, number one.

Number two, if we assume *arguendo* that content is being collected, right, nothing is leaving the television -- okay? -- except for the last three fingerprints that are generated each minute -- okay? -- in the last second half of minute. Okay?

THE COURT: So --

MR. SPERLING: Among other things. Like, I don't want to lay out the whole defense here, Your Honor.

But we -- the witness testified -- and we don't dispute that the witness testified that the ACR technology goes to work by looking at the pixels that are on the screen. That's clear. She has that testimony. I think that should resolve everything. I am not sure what more she is seeking.

THE COURT: So let's -- let's drill it down that way, then, Ms. Weaver.

He said the ACR technology goes to work by looking at the pixels on the screen.

MS. WEAVER: Right. And this is paragraph 44 of my complaint; so this is consistent with what we've always said.

THE COURT: Yeah. I've --

(Simultaneous conversation) -- times. Yeah.

MS. WEAVER: The software captures information about a selection of pixels on the screen.

THE COURT: Right.

MS. WEAVER: So I need to know that the pixels that it's capturing come from the -- the intercepted communication.

So I've been denied discovery of the communication that is, in their view -- I view this as -- I'll be honest. I think -- I view this as an interception. But they're going to make another argument that I need to defeat.

To me, essentially the way this technology is operating in my understanding and I will explain it to a jury -- is it's taking a digitized picture twice a second of what's on your screen.

They are going to argue -- I don't think it's right -- I think we win because it's doing it every two seconds.

They are going to argue that the ACR is not taking a photo of what the image on the screen is. I need to be able to argue that. I have no facts because I can't see what the ACR software is operating on.

So I need the dataflow. This is what I've always meant by "realtime dataflow." What is coming in, and in that moment where they begin to, however they want to describe it --

THE COURT: Look at the pixels on the screen.

MS. WEAVER: --

THE COURT: Now, I know that.

So what exactly are you asking them for?

MS. WEAVER: I need -- I need a description of the pixels on the screen and the timing of it before ACR starts operating.

THE COURT: To do what --

(Simultaneous conversation)

MS. WEAVER: Either a diagram or a -- so I can see -- because they're telling us what the specific data points and how it operates. I need to be able to show my expert what is coming in and how it -- it could be sample of it -- but what is coming in that the ACR is then operating --

THE COURT: All right.

MS. WEAVER: -- is I can say to a jury, oh, they're saying it's not a photograph but this is what's arrived and this is what they took.

They're only giving me this is what they took.

THE COURT: So you're saying the ACR -- Mr. Sperling, the ACR doesn't take a picture of the image on the screen; right?

MR. SPERLING: Correct, Your Honor. It's the whole pixel brightness process that we described --

(Simultaneous conversation)

THE COURT: So --

(Simultaneous conversation)

MR. SPERLING: But it looks at the pixels on the

screen to do that.

THE COURT: Okay.

MR. SPERLING: And she has that testimony.

THE COURT: Does she have any diagrams? Does she have any documents or flowcharts to show that?

MR. SPERLING: She has the document you're holding, Your Honor, which begins, the very first step, as the witness testified and describing this document --

THE COURT: What page are you on?

MR. SPERLING: Sorry, Your Honor. It's the page with the Bates number ending in 608.

THE COURT: Yeah, but what -- so. Right. You're saying the first thing that the -- the dataflow showing the ACR technology going to work, the first thing it does is demonstrated in this first box on 45608, the frame? There is nothing before this.

MR. SPERLING: In terms of the operation of the ACR technology, Your Honor, that's correct.

THE COURT: No. In terms of what it starts to do.

An image comes on the screen; right? That's the first -- we talked about this.

MR. SPERLING: The TV displays an image. The TV displays an image whether you're running ACR technology or not.

THE COURT: Right. Got it.

MR. SPERLING: Okay? So now let's compare two people that are sitting side by side. They're watching two televisions, two Samsung Smart TVs, same program, same time. Okay? One of them has opted into the visual information services prompt that they get, which we call a consent; right? It's opting to that that enables the operation of ACR. Sworn testimony, if you don't opt in to the -- it doesn't run.

THE COURT: I got it. So let's -- I'm already late for my next meeting.

MR. SPERLING: They both have the same image appearing on the screen. The one who has opted in and has ACR technology running, the ACR technology -- I'm just characterizing what the witness testified to -- okay? -- that ACR technology will look at what's on the screen of that one -- right? -- and begin the process that is shown on this page marked 45608 of reducing -- taking a region of interest, reducing it black and white, assigning brightness values to the pixels, et cetera.

THE COURT: Got it. Got it.

MR. SPERLING: That is the operation of the ACR technology.

She has it from the beginning of the ACR technology. It sounds like now what she's saying is she wished she had once upon a time asked how does the television

come to ever display an image on the screen. Then we were --

THE COURT: All right.

Ms. Weaver, explain, then, what are you --

MS. WEAVER: Sure. Your Honor, effectively, all of the ACR operation is how they intercept; right?

THE COURT: Right.

MS. WEAVER: I need what they are intercepting so I can -- and the timing of it.

THE COURT: Well, wait, wait --

MS. WEAVER: So this is like --

THE COURT: We know what they're intercepting because it's all in your second amended complaint, all of that information.

MS. WEAVER: I can't prove it in a dataflow. That's my allegation.

THE COURT: Doesn't that --

MS. WEAVER: So I -- Your Honor has said it a thousand times, what I really think you're getting it. It's just confusing --

(Simultaneous conversation)

THE COURT: No, I get it. But you guys keep talking past each other. So I can --

(Simultaneous conversation)

MS. WEAVER: I just want what they are -- like, please just let me use the snapshot.

I just want what they're taking a photograph of --

(Simultaneous conversation)

THE COURT: But they --

(Simultaneous conversation)

MS. WEAVER: I have how -- I have what they say they're taking.

And I have their defense that they're not taking everything or that it's not really a photo or whatever. There's nothing in the wiretap claim that says you have to take the entire communication. They are taking some information out of this communication to show what they are taking. I have to show the initial communication coming to them and how that operates.

He -- what the witness said --

THE COURT: He showed it. Isn't this it?

MS. WEAVER: No. This is what happens after. What the witness --

(Simultaneous conversation)

MS. WEAVER: No, let me -- what the witness said is there is frame and there is glass.

And I said, "Where is glass on this?"

And he said, "It's not here."

THE COURT: What did he say after that?

MS. WEAVER: He said -- his fix -- his amended testimony, according to them, is that glass is not on this

diagram at all.

THE COURT: No, no, no. He said, "It's not here."

And then what -- you asked him the next question, where it is.

And he said -- what? -- I need to take a break?

MS. WEAVER: No, no, no. Sorry.

He -- I -- his original testimony was that it was on this diagram.

And then he came back after the diagram [sic] and said, no, it was before then.

And so that tells me that I am missing a whole chunk of the diagram --

(Simultaneous conversation)

THE COURT: Okay. So let's talk about the -- you're saying it was before then?

MS. WEAVER: Yes.

MR. SPERLING: Your Honor, originally the witness testified that the ACR technology is looking at signal -- let me step back.

THE COURT: No, no. I can't have you step back. I have take another call here. And I'm -- I'm at a loss --

MR. SPERLING: The witness also, he testified, Your Honor, to exactly what I described. The witness testified that the ACR technology looks at what is on the glass. Okay?

What is on the glass is whatever the user is watching at that moment.

THE COURT: Okay. And at that moment, that's -- so that's -- I said this now seven times, and I think -- I don't think you're not doing -- I know you're not doing it deliberately, but you're confusing me.

Ms. Weaver, that's the moment.

The question becomes once --

MS. WEAVER: No --

THE COURT: -- the image comes on the screen; right? The image has to --

MS. WEAVER: It's not in this diagram --

(Simultaneous conversation)

THE COURT: Wait a minute --

(Simultaneous conversation)

THE COURT: Wait a minute. The ACR technology is not putting the image on the screen; right?

MR. SPERLING: Right.

THE COURT: It is the consumer choosing what to watch.

MR. SPERLING: Correct.

THE COURT: Right?

MS. WEAVER: Right. Let me -- let me redo the testimony.

Now, the earlier you said the frame is not the

glass. Is that right?

The frame is not the glass.

Correct.

Where is the glass in this dataflow?

The glass is not in this dataflow.

Where would it be if you were going to draw it?

If I were going to draw this, it would be the frame goes to the glass next.

And then he redid it.

THE COURT: The frame goes to the glass --

MS. WEAVER: Next --

(Simultaneous conversation)

THE COURT: Right --

(Simultaneous conversation)

MS. WEAVER: And then this is what he corrected.

Then after the break, he came back and said, counsel -- the witness has a correction to make.

And he said, my lawyer reminded that I talked with these SEC engineers. And the SEC engineers now say I incorrectly stated that we would -- the arrow between frame and glass. That is preprocessing. SEC informed me that preprocessing happens after it goes through the glass.

So I now need the diagram of what happens --

THE COURT: Preprocessing happens after it goes to the glass so that the glass, whatever that is --

MS. WEAVER: So the glass is happening ahead of time.

THE COURT: -- and glass and frame are apparently not synonyms.

MS. WEAVER: Right? Glass is what appears on the user's --

THE COURT: All right.

MS. WEAVER: I need the diagram of what happens before this.

MR. SPERLING: Your Honor, nothing --

THE COURT: Do you have it?

MR. SPERLING: No, Your Honor, because nothing she just said is inconsistent with what the Court said.

What the witness ultimately --

THE COURT: Well, it doesn't matter what I said.

I'm saying based on what I think the testimony of the witness is.

MR. SPERLING: No, no. What the -- what the Court understood, what the witness ultimately testified so is that the glass, meaning the screen that the user is looking at -- right? -- is what the ACR technology looks at to go to work. That's what he said. Glass. Okay?

And the ACR technology looks at what is on the screen -- i.e., on the glass -- and goes to work.

That was his ultimate testimony. Okay?

I still do not understand what more counsel --

(Simultaneous conversation)

THE COURT: So, then, where is -- where does his testimony say that the ACR technology gets involved at the glass stage before the preprocessing stage?

MS. WEAVER: Well, the -- well, he -- that was the earlier testimony.

And then he recanted, so I want --

(Simultaneous conversation)

THE COURT: No. No, no. The earlier testimony, I said, is he placed glass between frame and border removal.

And then he came back after the break and said, "My bad. I talked to the engineers from the SEC, and they told me actually glass" --

MS. WEAVER: Right.

THE COURT: -- whatever that is -- occurs before.

MS. WEAVER: Right.

THE COURT: So what is it about that testimony that the ACR technology is involved in the glass --

(Simultaneous conversation)

MS. WEAVER: This is -- this is their argument --

(Simultaneous conversation)

THE COURT: No, no -- your argument. I wondered what did he say? Did he say anything about that? Did he say --

MS. WEAVER: I'm sorry --

(Simultaneous conversation)

THE COURT: -- ACR's involved the --

(Simultaneous conversation)

MS. WEAVER: Yes, this is all ACR.

THE COURT: No, no, no, no.

The testimony.

MS. WEAVER: Yes.

THE COURT: Did he say, "My mistake. The glass process is actually before the preprocessing frame" --

MS. WEAVER: Yes, I'll read it again --

THE COURT: Wait.

And the ACR technology goes to work during the glass stage.

MS. WEAVER: He doesn't say the last piece because I -- I don't --

THE COURT: Do you see what I'm saying? It's all about the ACR technology.

MS. WEAVER: Right, right, right.

THE COURT: You had said to me --

MS. WEAVER: I understand --

(Simultaneous conversation)

THE COURT: -- we want to -- we want to see --

(Simultaneous conversation)

MS. WEAVER: ACR technology, Your Honor, is how

they are doing the -- how they are taking the image and the -- well, how they're taking the information --

(Simultaneous conversation)

THE COURT: How they're taking this frame and doing stuff with it --

(Simultaneous conversation)

MS. WEAVER: And so the question that I -- we are trying to answer is what are they looking at ahead of time?

(Simultaneous conversation)

THE COURT: No, I know what you're asking. But if the ACR technology isn't doing anything I head -- I'm with you a 150 percent, that you are entitled to see how this ACR technology works, what is it gathering --

MS. WEAVER: Yes --

(Simultaneous conversation)

THE COURT: What is looking at --

(Simultaneous conversation)

MS. WEAVER: What is working on --

(Simultaneous conversation)

THE COURT: What is collecting?

But they're saying it starts here.

MS. WEAVER: Yeah, but what is it --

(Simultaneous conversation)

THE COURT: -- here --

(Simultaneous conversation)

MS. WEAVER: Okay. So this is like saying, yes -- this is like saying I took a photograph but I am not going to show you what I took the photograph of.

THE COURT: No, it's not because this is what he took a photograph of.

MS. WEAVER: It's not -- no. Glass is not in this diagram.

THE COURT: No, I know glass isn't in the diagram.

MS. WEAVER: Yeah.

THE COURT: I'm trying to understand where does the witness testify that ACR technology goes to work during the glass phase as opposed to the --

MS. WEAVER: It is --

(Simultaneous conversation)

THE COURT: -- preprocessing phase.

MS. WEAVER: I don't know because I don't have the discovery. That's the whole question.

THE COURT: No, did you ask the witness?

MS. WEAVER: Yes. Well, yes --

(Simultaneous conversation)

THE COURT: And he said what about that?

(Simultaneous conversation)

MS. WEAVER: I don't --

(Simultaneous conversation)

MS. WEAVER: I don't really understand what --

honestly, Your Honor, I'm saying --

(Simultaneous conversation)

THE COURT: Okay. I'm going to do it one more time, and then, of course, I am going to have to take a break because I have conferences that are backing up.

This whole case, the whole case, whether it's relying alone on the pleadings or whether it's based on what the parties have been conducting in discovery, has been that this ACR technology -- let me pull it up again, paragraph 38 -- is used to capture in real time billions of viewing data points each day for millions of consumers' Smart TVs manufactured and sold by the defendants.

39: They monitor and track in real time what consumers are watching, what consumers are saying, and the viewing habits of those consumers. And then they transmit that confidential private information to the servers.

So, they monitor and track in real time what consumers are watching, what they're saying, and their viewing habits of those consumers.

Are saying that there's discovery or there's some sort of -- yeah, there's some kind of evidence that's come to light that they monitor and track in real time what's been watching and consumers are saying and their viewing habits before an image appears on the screen?

MS. WEAVER: Well, that's their contention. That's

what they say when the interception has to be, which doesn't make any sense to me --

(Simultaneous conversation)

THE COURT: No but I'm --

(Simultaneous conversation)

THE COURT: -- legal argument --

MS. WEAVER: Okay.

THE COURT: I'm interested in trying to help you get --

(Simultaneous conversation)

MS. WEAVER: I just need to know what's actually happening.

This what I asked. I think this is what you're asking.

"Okay. Mr. Farr, looking at the frame section of the preprocessing diagram here, is the frame capturing glass-level data here?"

THE COURT: What does that mean, "glass level data"?

MS. WEAVER: That's what the image is. Remember glass-level is the image that the user sees.

So the frame capturing glass-level data detail here?

He says, "In that instance, it's the pixel data being sent to what we would call the glass.

"And what is the glass?

"The thing that, you know, the viewers watch.

"So to be clear, the glass is what SEA calls the thing the viewer is watching. Is that right?

"The glass is the output of the TV in visual form."

And then I said, "And so a fingerprint is different than the glass; right?"

"Yes."

And then there's a little bit of a colloquy.

So we -- about what fingerprinting.

So I say, "And so in this dataflow here -- let's just keep walking through it. It says, 'border removal and it gets central area,' all of this is ACR operating?"

And I don't have the information about when it starts as opposed to -- like, in terms of the timing, when does the image appear on the user's screen?

They're saying my case is only about how they're taking the photograph, how ACR is operating.

And I need to know the timing of what appears and what is being taken.

THE COURT: All right. I'm going to take break now.

But let me make something very clear because, once again, now, it's clear as mud.

Your case is about -- and you're entitled to

discovery on how the ACR technology monitors and captures viewing history, preferences, and the like -- and all this other allegedly private confidential information about the class -- at what point in time the ACR technology starts to do that.

What you just read to me doesn't that explain that at all. It just doesn't.

You're not using the words "ACR technology." You're talking about glass and that -- I don't even know.

But at the moment the ACR technology goes to work -- and I don't mean collects. I mean starts to do something --

MS. WEAVER: Exactly, Your Honor.

THE COURT: -- I am not so sure, though, you're entitled to more. So, sure, you're entitled to say you've given it at all.

I'm still very concerned. Seven years into the litigation, why it is not a simple thing to ask a witness when does the ACR technology and how does the ACR technology start to capture this information?

And it seems to me it's here. If you're saying there's something suggests that it's earlier than this, based on some very unclear testimony to me about glass, I don't know what to say. I really don't -- unless I read this entire transcript. I don't know what to say.

But I'm going to take a break because, once again, I now have other parties that are being delayed because of this case.

So we're going to take a break. I'll be back.

(Recess)

THE COURT OFFICER: We are back on the record.

THE COURT: All right. We're back on the record in White versus Samsung. We had to take a -- the Court had to take a break to attend to other conferences.

So before the Court adjourned, there was a -- the court was addressing dispute between the parties in connection with the deposition testimony of a 30(b)(6) witness of the defendant, Mr. Farr, and we were having a discussion about plaintiff's request for diagram, other discovery, including, I guess, information and documents that precede the preprocessing stage as set forth on the SEC Bates stamp number 00045608, which is described as the video fingerprint extracting --

I don't need to hear anything else on this. I'm going to -- I'm prepared to make a ruling -- because I understand the parties' positions as have been explained in detail, both on the record today and in the parties' letter -- I think it's a letter -- I say "think" because I still can't follow if these are reoccurring or new issues that the parties keep talking about in their April 8th and

their April 14th letter -- April 15th joint letters.

Be that as it may, as I said, I've spent much time on the record today addressing this dispute.

And based on the representations, as I understand, as counsel has explained the discovery that is sought and based on the representations of defense counsel explaining how the ACR technology works and how it, quote, gets to work and based on the excerpted deposition testimony of Mr. Farr that has been read into the record today, I am going to deny the plaintiff's request for any diagram or other discovery that precedes this preprocessing stage, as I just referenced on the record, that's set forth in SEC -- Bates stamped SEC 0045608. I don't find that it's relevant, the request for this information, even to the extent that any of this discovery exists. And I'm just exercising this Court's discretion under -- and guided by Rule 26(b)(1) about the general scope of discovery. As I said, although it's broad, the party seeking discovery has the burden to show that the information sought is relevant to subject matter of the action and may lead to admissible evidence. And for the reasons I've already set forth, I find it's not. And so that request is denied.

Now, I said I was going to address only the issues in the April 8th letter, but some of those issues I already addressed today; some of the issues in the April 15th letter,

I think I've already addressed today. But, again, it's very confusing from the parties' submissions.

The one issue I said I was going to address today in addition to RFP 38 and this issue about whether there's overlap between the fingerprint data and the matching database -- I hesitate to ask this question: What is the issue of the matching database to the extent that's a separate dispute that this Court has to resolve that's unresolved -- parties? What's the issue?

MS. WEAVER: Your Honor, I hate to do this, but with respect to your previous ruling, there's the time period problem as well, which is we got no testimony from October -- prior to October 2019 --

THE COURT: Okay.

MS. WEAVER: -- or documents.

THE COURT: All right. So they produced a 30(b)(6) witness who testified only about 2019 to the present?

MR. SPERLING: Your Honor, it is absolutely the case -- and as plaintiff's counsel says, when he was first asked, first asked, whether he had knowledge of anything before October of 2019, he said no, he did not.

Okay?

On redirect, he was asked, "Mr. Farr, you testified that as part of your preparation for today's deposition, you had a conversation with one or more SEC engineers; correct?

"ANSWER: Correct.

"And did you testify that you also conversations with Tom Ryback [phonetic] of SRA?

"ANSWER: Correct.

"In your discussion with SEC's engineers, did you discuss the operation of Samsung's ACR technology prior to October of 2019?

"ANSWER: Yes."

THE COURT: Starting from when. I gave a date from when the class period --

(Simultaneous conversation)

MS. WEAVER: May I --

(Simultaneous conversation)

THE COURT: -- when the relevant time frame should be -- because the parties were unable, despite months and months of conducting discovery, agreeing on what the relevant time frame is. And so the Court had to make a ruling, and I remember, I said it was sometime in 2014.

So this may end up being the last issue I'm going to address today because I have a feeling it's going to be a long and exhausting discussion -- because, again, the sky is white, the sky is black. I'm at a complete loss about how these two sides cannot agree on a single issue in this case. I just had a conference where I had to make a ruling on whether the 30(b)(6) deposition should take place at whose

offices -- because they couldn't agree on that.

But I don't -- I don't know what to say. You want me to read a deposition transcript as to whether or not you produced somebody for -- who could testify about 2014 to 2019?

MR. SPERLING: To, Your Honor, here's the testimony he gave about the before 2019 --

THE COURT: I don't want to hear it. I don't want to hear it. I don't want to hear it.

Your contention, Ms. Weaver, is that they didn't produce somebody who could testify about the topics that I didn't strike that I allowed to go forward before 2019?

MS. WEAVER: He said that very clearly, and then at the very end of the deposition, six and a half hours later, his lawyer asked him on redirect, oh, hey, did some of these topics come up?

At the outset of the deposition, 10 minutes in, what I read to you is what he said.

And I can read it again --

THE COURT: No. I don't want you to read it again. I don't want you to -- I don't want you to read it again.

MS. WEAVER: I took the entire deposition --

THE COURT: No.

MS. WEAVER: -- focusing it on 2019 afterward. And then at the end of the deposition, on redirect, he tried to

act as though I should have asked --

THE COURT: Okay. So -- so --

MS. WEAVER: Yeah.

THE COURT: -- did have a colloquy about this? Because I can tell you what didn't happen is nobody called me. Nobody called me when you're having a dispute about the sufficiency of the testimony and whether or not the defense produced somebody who was capable of testifying about the relevant time frame.

And here I am now --

MS. WEAVER: Your Honor, I asked him, "Did you do anything to prepare for your deposition? Did you take any steps to inform yourself about SEA's ACR data collection prior to October 2019?"

This is the same sequence, the first 10 minutes in the deposition --

(Simultaneous conversation)

THE COURT: Okay. Here's --

(Simultaneous conversation)

MS. WEAVER: -- and he said no.

THE COURT: So here's what you're going to do. You're going to send me the deposition transcript.

MS. WEAVER: Okay.

THE COURT: And I'm going to reserve ruling on that issue.

MS. WEAVER: Great.

THE COURT: I want it by tomorrow.

Next issue.

What's the next one?

MS. WEAVER: You were asking about the matching database, Your Honor.

MR. SPERLING: Your Honor, can I offer a proposal to try and simplify the Court's life, nothing more than that.

THE COURT: You could. But you had eight hours today to talk about this amongst yourselves.

But what's your proposal?

MR. SPERLING: Your Honor, we would be happy to offer verification -- okay.

THE COURT: No. Denied.

I want to see the deposition transcript because I don't know what to do anymore except review everything myself. I don't know what to do anymore -- because snippets of he said, yup, I was prepared and I did testify about everything pre 2019 or, no, he didn't. He said very clearly it's just 2019 and beyond.

I've never -- I've never dealt with this issue as a litigator or as a judge, the inability to agree on anything, let alone what deposition testimony does or doesn't say.

So I'm going to have to review it all myself.

MR. SPERLING: Your Honor, can we include, with no

narrative commentary whatsoever, just references to particular passages at the deposition?

THE COURT: For what purpose?

MR. SPERLING: It might make it easier for Your Honor rather than reading the whole thing --

THE COURT: No.

MR. SPERLING: -- if both parties point to particular passages.

THE COURT: I'll read the whole thing.

You guys can't even agree on what "data" means. I don't even understand your letters. I -- me and my staff have read your letters. I can't even understand if there's one dispute or four. That's how bad this is.

So I'm going -- you're going to point to stuff in the transcript, and guess what's going to happen? I'm going to have to read the whole thing anyway. I'm going to have to read the whole thing anyway.

So -- and if it's not clear from the face of this deposition transcript whether or not you've produced somebody or not, I'll deal with that separately.

But I'm going to read it and have to figure out -- because I've asked you to resolve these issues and you resolve nothing, no matter how many meet-and-confers you have, whether I fly you here or I have you do it over the phone or on video conference.

But here we are. Here we are.

It's almost 5:00 o'clock.

MS. WEAVER: Your Honor, I might --

THE COURT: You haven't resolved anything.

MS. WEAVER: I might be about to make you happy. I'm going to --

(Simultaneous conversation)

THE COURT: Unless you tell me you've settled the case, you are not going to make me happy.

MS. WEAVER: But what we did offer earlier on the matching database is a concession to the defendants if we could get what's called a conference code, and it's a little bit complicated and you don't need to get in the weeds --

(Simultaneous conversation)

THE COURT: Did they accept it or not?

MS. WEAVER: We're waiting -- they -- well....

THE COURT: No, no, no did they accept -- it doesn't matter what the proposal --

(Simultaneous conversation)

THE COURT: That was the whole point of the meet-and-confer -- right? -- is I'm supposed to sit there and deal with only the issues you didn't resolve.

But you've resolved nothing. Nothing.

So unless you've resolved this issue about the matching database, then I'm going to have deal with it.

Probably not going to resolve it tonight.

MR. SAMRA: I think on the -- just to clarify what we asked for earlier was identification of the application used to open a reference data.

What we heard back was they would take it under advisement.

THE COURT: Wait, wait, wait, wait, wait. So you're trying to resolve that one -- is --

MS. WEAVER: They produced something to us that we can't open. --

THE COURT: Under Rule 37, you meet and confer.

If you can't resolve it, you seek Court intervention.

Are you seeking Court intervention now on this matching database dispute?

Made a proposal --

MS. WEAVER: The proposal was this --

THE COURT: No, no, no. Don't want to know what the proposal is -- because if I don't have to resolve something, I don't want to resolve it.

Are you -- is the defense considering what their proposal was, -- what? -- that you gave them today to try and resolve this?

Or is this something that preceded the letter that now I have to deal with? When was the proposal given to

them? Today?

MR. SPERLING: Yes, Your Honor, this morning in your courtroom for the first time.

THE COURT: Fine. Okay. Fine.

So you -- it's under -- you're taking it under advisement?

MR. SPERLING: Yes, Your Honor.

THE COURT: So then it's not ripe for the Court to decide.

MS. WEAVER: -- Your Honor. That's what I was hoping --

(Simultaneous conversation)

THE COURT: All right. So you can get back to me by May 1st. It won't be in that same letter. Tell me whether you've resolved it or not.

I don't want to know your positions. I just want to know if you resolved it, yes or no.

I have your positions in two letters, I think, at least.

So I don't need any more commentary on it.

What else? I am not dealing with the content ID issue, RFP 41. I told you I'll already deal with that in a written ruling.

All right. So that takes care of the April 8th letter.

I, for the life of me, can't understand if first, second, third, fourth, fifth, sixth issues that the plaintiff identify are part of what I like to say a Venn diagram or they're all different issues. I have no idea.

It looks to me like the first issue, the fourth issue, maybe the fifth issue, all are related to the ruling where I just denied.

So what is -- what do I have to resolve -- even though I said I was not going to deal with any of this today, I am going to have to deal with it at some point.

I'd rather just deal with it now, if I can.

So let's talk about it.

The first issue, testimony from Samsung 30(b)(6) -- this is on page 2 or April 15th letter -- testimony from Samsung's 30(b)(6) designees last week reveals that what SEA has described as fingerprint data is not, in fact, realtime data. Thus, to date -- no. No. I've already ruled on this. So that's denied.

Next issue, with respect to fingerprint data -- this is Number 2 on page 2, with respect to fingerprint data, which SEA's testimony confirms is analyzed data, plaintiffs request a production of such data from plaintiff White's TVs. SEA lawyers claim that SEC advised that it, quote -- it is not feasible to collect and produce exemplars of fingerprint data for plaintiff White. But this bare statement by SEC's

counsel is not evidence. Plaintiffs further understand that it is possible to collect data flowing from a specific SmartTV.

Footnote 1, plaintiffs expect Samsung to preserve data relating to the propose- -- all right. This was part of my -- I think it was my March 14th order. I am not even sure, but I'm going to look right now. This goes to, I think, paragraph 4: [As read] Defendants shall confirm with SEC whether produced exemplars or fingerprint data are representative -- is this that issue? Or is this a different issue?

MR. SAMRA: That's right, Your Honor. And it's --

THE COURT: Okay. So request production of the data from plaintiff White's TV.

And SEC says it's not feasible.

What's going on?

MR. SPERLING: Your Honor, Mr. Farr testified under oath as follows in response to Ms. Weaver's questions: "When the pixels are fingerprinted, does the fingerprint data include identifiers?"

The witness: "Do you mean the pass of the fingerprint from the TV?"

"QUESTION: Yes.

"ANSWER: The only what I would qualify as identifier that's sent along with the hash" -- the hash is

the fingerprint, as we discussed earlier, two different names for the same thing -- "is the IP address.

"QUESTION: Is the fingerprint linked to a TV in any other way than the IP address?

"ANSWER: Not when it's first sent from the TV."

So it's not just our representation. They have sworn testimony that when the fingerprint is sent, there is no identifier associated with it other than the IP address. Okay?

As a result, there is no way to -- for us to capture -- first of all, we don't maintain the database. Right? SEC handles this process.

But SEC informed us and it's validated by the testimony that there is no way to capture an individual user's fingerprint data when it's sent to the matching server because there is no identifier --

(Simultaneous conversation)

THE COURT: -- and the exception of the IP address.

MR. SPERLING: The exception of the IP address.

THE COURT: Did you provide the IP address that you've collected from Mr. White?

MR. SPERLING: Your Honor, so I am not -- IP addresses, but we are talking about his IP address. So this would be -- this would be akin to if Your Honor would go on to some connected device that Your Honor maintains, go to

some website for the first time. Okay. You know, and then somebody comes to the website and says, give me the record, the log that you have or Judge Allen's visit to the website. Like -- but they have no way of associating the IP address, okay --

THE COURT: I thought you just said the one thing they can do is for the specific TV, and in this case we're talking about Mr. White. The only fingerprint, hash, whatever you want to call it, data is the IP address that's the only thing.

MR. SPERLING: So there's two things, Your Honor. First of all. Yes, the TV, which is connected to internet -- and like all devices connected to the internet has an IP address. Okay? The TV has an IP address.

THE COURT: Right.

MR. SPERLING: Okay? That is the only identifier that's associated with the fingerprint when it's sent from the TV to the matching server. There's nothing to say this is Mr. White's television. It's just an IP address. That's point number one.

Point number two, SEC informs us and we have informed plaintiffs that in all events, okay, no individual fingerprint can be captured and preserved. It's the database. There's a match or not, and it is discarded immediately. They don't have a way to pull them out --

okay? -- in that process. And SEC is not inclined to rework how they manage this in order to somehow be able to capture an example of this individual fingerprint, even if they had the IP address. And I don't know if that's feasible to provide the IP address.

But it's two distinct things. There is no personal identifier. And in all events -- SEC -- this is not us, Your Honor. We don't maintain this. SEC says, we cannot capture an individual's fingerprint.

THE COURT: You've given exemplars of fingerprint data?

MR. SPERLING: Yes, we have, Your Honor.

THE COURT: Okay. So the only issue that's left is and as my order says, the collection and production of exemplars of the fingerprint data for White, if it's feasible to collect and produce them, then do it.

And you're saying, can't; it's not feasible.

MR. SPERLING: Correct.

THE COURT: It's what SEC has said.

MR. SPERLING: Correct, Your Honor.

THE COURT: And you certified that in an answer to a discovery request?

MR. SPERLING: We've provided it. We haven't certified it, Your Honor. We can certify that that's what SEC told us.

I think that's part of the issue here is they say, well, SEA should certify that under penalty of perjury.

Like, we're relaying information. It's not our information.

THE COURT: I agree. You can relay what they told you.

MR. SPERLING: Correct, Your Honor.

MR. SAMRA: Well, Your Honor, I think there's two issues: One with respect to plaintiff White's television. First, I think, what we're hearing is --

THE COURT: Well, no -- you've said. They've said, it's a statement. Right and you don't --

MR. SAMRA: It's not evidence.

THE COURT: Well, no one's saying it's evidence.

MR. SAMRA: Right.

THE COURT: It's about what they can produce in discovery.

MR. SAMRA: Okay. But -- okay. So what they can produce in discovery, we have testimony from their 30(b)(6) representative saying that they test fingerprints and they do this at --

THE COURT: I don't know what that means, you test fingerprints.

MR. SAMRA: They -- when they get a request from an advertiser to create a fingerprint of certain content --

THE COURT: Right.

MR. SAMRA: -- they'll test that.

THE COURT: For individual --

MR. SAMRA: No, but --

(Simultaneous conversation)

THE COURT: Because that's what we're talking about here --

(Simultaneous conversation)

THE COURT: Not the exemplars. We're talking about what's a representative sample. We're talking about Mr. White.

MR. SAMRA: So with respect to Mr. White --

THE COURT: Yup.

MR. SAMRA: -- well -- there -- our expert can tell that there is data leaving the TV and that it goes to the matching database domain.

What we can't tell because we don't have the --

THE COURT: When you say -- sorry to interrupt you -- that it's leaving the TV -- right? -- and it's going to the matching database, are you talking about Mr. White's? -- your expert knows it's Mr. White's information?

MR. SAMRA: We can -- we can run that test on Mr. White's television.

THE COURT: I don't know what that means.

Your expert has data. I don't know where he got it based on what the defense has produced or he got it directly from your client, Mr. White.

But either way, it's just about -- they've made a represent- -- what do you want me to do? They've made a representation here. So go ahead.

MS. WEAVER: This is a proposed solution --

(Simultaneous conversation)

THE COURT: Go ahead. Go ahead.

MR. SAMRA: Well, I'm simply saying that it is possible to see the data that is leaving a television. But it's encrypted for us. So we don't have the ability to see the data leaving Mr. White's television.

We can run a test, but we need the decryption key in order to understand that data.

THE COURT: But --

MS. WEAVER: This is a solution.

They are saying they can't produce it. So we are saying we will test his television and have our expert see the export of his data.

So all we need is the decryption key --

THE COURT: How do they figure out in -- I don't know -- 2 billion televisions, how would -- whatever data they've collected, how would they figure out Mr. White's?

MS. WEAVER: So this is -- set that aside. That's

not what we're --

THE COURT: And, by the way, that's --

(Simultaneous conversation)

MS. WEAVER: Because they match it.

But let's set that aside. Let me -- what we're doing is proposing something completely different.

Our expert --

THE COURT: -- proposed it to them yet?

MS. WEAVER: Yes. Our expert will test Mr. White's data -- so it is his data because it's flowing from his television.

THE COURT: I've got to interrupt you.

You proposed it to them, and they rejected it?

MS. WEAVER: Yes.

THE COURT: So what -- I don't want to talk about your proposals.

If they rejected it -- what do you want -- we're back to where we were. You're still asking me to order them to --

MS. WEAVER: Just so -- yes. I'm asking you to order them to produce the decryption key so we, ourselves, can test the dataflow coming from Mr. White's --

(Simultaneous conversation)

THE COURT: Wait a minute. No.

My order said -- and the issue is not in

paragraph 4 of the March 14th order. It's not -- the issue before me is not about the exemplars of fingerprint data as represented for the period May 16th, 2014, and beyond.

The issue is about the collection and production of exemplars of fingerprint data for plaintiff White.

And they have to con- -- the order was they had to confirm with SEC whether collection and production of exemplars of fingerprint data for plaintiff White is feasible. That's what the order said. I said -- I directed them to go back and talk to SEC and determine if it's feasible.

And if it's feasible, they've got to work with SEC to collect and produce it for the plaintiff White.

He's not made a representation that SEC said it's not feasible. You've got your letters rogatory. You want to go ask SEC and catch them in a lie? I mean, I guess you can do that.

But this is what they told -- I have an officer of the Court. He should certify that SEC said to them, SEA's counsel, it's not feasible.

I don't know what more I can do, though. That's what I had ordered -- because we weren't sure if it was feasible.

Tell me I am not -- that -- what you're bringing up is a whole new solution. I don't know what to tell you.

This is what the order was. And I directed them to do it, and they're telling me it's not feasible based on what the SEC representations have been.

MR. SAMRA: Understood, Your Honor.

I think -- we don't have to dwell on this for much further.

I would just say that feasible is a statement that could mean many things, and we don't have the ability to understand where this representation came from, test it.

Well, I'm providing a solution that is available on our end that we know is there and is easy to do.

But we don't have that dialog going back and forth about what is and isn't feasible.

THE COURT: So in your explanation to them, in the answer, did you explain, based on SEC's representation, about what made it not feasible? What you just explained to me.

MR. SPERLING: Your Honor, I'm going to check.

THE COURT: Okay. Because if you didn't, I'm going to direct you to do that.

MR. SPERLING: Sure, Your Honor.

THE COURT: And explain it.

And, look, these were document requests? Were these subject to a document request? I forgot -- or an interrogatory? I don't even remember anymore.

MR. SAMRA: We have a request for the data that

relates to the --

THE COURT: It's a document request?

MR. SAMRA: -- plaintiff's, yes.

THE COURT: Okay.

So then you should certify to what SEC has represented as to why it's not feasible, explaining why it this not feasible.

MR. SPERLING: Give me just a moment, Your Honor.

THE COURT: Sure.

MR. SPERLING: So I'm going to read to the Court what we wrote to them.

THE COURT: Sorry?

MR. SPERLING: I'm going to read to the Court exactly what we wrote.

[As read] In response to SEA's request regarding --

THE COURT: No. I'm sorry to interrupt you.

MR. SPERLING: Yeah.

THE COURT: What did you relay to the plaintiffs.

MR. SPERLING: No, that's what I'm saying.

THE COURT: This is in a letter you sent to the plaintiffs.

MR. SPERLING: This is a letter we sent to the plaintiffs. Correct, Your Honor.

THE COURT: Oh.

MR. SPERLING: So they perceived it from us in

writing.

[As read] SEC advised that it is not feasible to collect and produce exemplars of fingerprint data for plaintiff Thomas R. White in particular. SEC indicated that fingerprint data is not stored and, instead, is immediately discarded after the matching process. SEC further indicated that while it is able to observe fingerprint data at the server level and collect a random sample, it is unable to determine from which SmartTV the fingerprint data originated, and, thus, it is impossible to provide a sample associated with a particular SmartTV or user.

THE COURT: Can't you do a controlled test?

White still has Samsung TVs. Right? They've been -- isn't there a way to do some sort of controlled test and now we know it's White's TV that specifically you'd be looking at? Not for the purpose of amending the complaint to say they are collecting and analyzing more data.

I'm just trying to think of a way here.

MR. SPERLING: I'm not sure what you mean, Your Honor.

THE COURT: You just said that it gets discarded right away.

But if -- that's because I get it, that's in the normal course. That is what they do. They don't maintain that in any way.

But if it's for the purpose of getting, I guess, an -- some sort of exemplar of the fingerprint data with respect to smart -- with White's SmartTV, is there a way to do it that way? Like a controlled test?

MR. SPERLING: So my understanding is that there is not, Your Honor, meaning the system runs. It's a business operation. They don't --

THE COURT: They don't isolate? Or they don't -- they discard it -- right? -- the technology discards it right away --

MR. SPERLING: The technology discards it right away, as I've just recited. It's thrown out immediately. Right? It's an instantaneous process. There's a match, or there's not a match, and the fingerprint is discarded. And it doesn't have an identifier.

THE COURT: All right.

So they gave an answer. I mean, they gave an answer. They did what I asked them to do.

If you want to ask SEC that -- for that information and SEC turns around and says, "Oh, yeah, we could do that. Not a problem," that's going to be a problem. It's going to be a huge problem.

But they did what I asked them to do; so there's nothing more than I can do about that.

All right. So that request is denied.

What else?

MR. SAMRA: Your Honor, I think the next issue is related to the same paragraph of Your Honor's March 14th order.

THE COURT: I'm sorry. You're talking about Number 3?

MR. SAMRA: Correct. And --

THE COURT: Now I'm confused, because I thought the -- I thought that they did produce exemplars of the fingerprint data representative for the class period as opposed to Mr. White's exemplar.

MR. SAMRA: Well, what they have said is that the three exemplars of fingerprint data that they have produced, they have heard from SEC are representative of the period of May 2018 to present and that before that period, a third party was involved in the fingerprinting process. And so they don't have possession, custody, and control.

MR. SPERLING: And, Your Honor, they got sworn testimony about that. So this would an example when Your Honor unfortunately reads the transcript, I guess -- so Mr. Farr did end up testifying about things that happened before October 2019.

THE COURT: That there's a third party that was responsible for --

(Simultaneous conversation)

MR. SPERLING: He testified that from the beginning of use of smart technology on Samsung's SmartTV until I believe May of 2018, a third party's proprietary software was used. He identified that third party. It's called Gracenote. He testified to that.

And he testified that the Gracenote technology -- proprietary, is owned by Gracenote.

THE COURT: Owned by what?

MR. SPERLING: Owned by Gracenote.

I mean, it's proprietary. And Samsung doesn't have Gracenote stuff.

THE COURT: Okay. So what exactly are plaintiff's counsel asking you to do then?

MS. WEAVER: We filed this case in March of 2017. If there was any issue regarding failure to preserve data, they should have done it to say --

THE COURT: Who? Grace?

MS. WEAVER: To say -- Samsung. If defendants --

(Simultaneous conversation)

MS. WEAVER: -- the defendant in this case had a third party collecting the fingerprint data for them. And they're saying it's no longer available May 2018 or before.

THE COURT: So I'm confused.

You had -- so a third party was responsible for generating the fingerprint data.

MR. SPERLING: Correct, Your Honor. They had their own process. Their process worked however it worked. It's not the process that I've walked through in terms of Samsung's technology.

Plaintiffs were aware of that at all times. They refer to it in the complaint.

So Gracenote is the successor to.

MALE SPEAKER: "Answer," spelled e-n-s-w-e-r-s.

THE COURT: Wait a minute. Grace -- Gracenote is the third party --

MR. SPERLING: Yes.

THE COURT: -- that was responsible for generating the fingerprint data from -- between May 2014 and May 2019?

MR. SPERLING: Correct, Your Honor. And Gracenote was at one time known as Enswers or "answers" [phonetic], Enswers.

And I'm telling Your Honor that because plaintiff's complaint specifically refers to Enswers, and Enswers --

THE COURT: But hold on a minute.

So is Gracenote no longer in existence? I mean, if they are generating Samsung's fingerprint data, I'm just asking, similarly to you asking SEC, you can't ask Gracenote?

MR. SPERLING: Your Honor, we could ask SEC to ask Gracenote for something, I suppose. It's quite a long chain.

THE COURT: You can ask Gracenote.

I don't know who -- look, I don't want to get into it, who's -- who's vendor it was.

MR. SPERLING: Yeah, my understanding, Your Honor, is that SEA would have to ask SEC to ask Gracenote.

I suppose we could ask Gracenote directly, but Gracenote would likely say to us, "We have nothing to do with you, and you weren't even our counterparty. So why would we probably turn over our proprietary things to you?"

We could go ask.

THE COURT: No. You could tell them you're a defendant in this lawsuit, and the information is relevant and pursuant to a court order.

If you're saying you've got to go through SEC, then go through SEC.

MR. SPERLING: We will go ask, Your Honor.

THE COURT: All right.

So -- and then I want a response by May 1st.

Four, Samsung says -- realtime data flow -- not testify with regard to any of the topics relating to the prior two.

This is my fun deposition transcript test. So that's -- I'm -- the Court's reserving on this issue.

Five, SEA's 30(b)(6) testimony from last week repeatedly referred to information derived from -- the SEA representatives to prepare -- this is all in connection with

the video fingerprint --

MS. WEAVER: That's just a subset of it, Your Honor. There was significant testimony that the witness had, having been derived from these engineers.

And we would like to hear it from the horse's mouth, Your Honor.

These are obviously relevant. These are the engineers that he had to consult with.

And -- wasn't just Mr. Farr. Mr. Evans also met with -- they would not provide the names to us. They would not even identify them by name in the deposition.

But both of the 30(b)(6) witnesses --

THE COURT: Well, what's the dispute? So is this just a request you're making? Or is there dispute here?

MR. SPERLING: Your Honor, it seems like a request to make for the first time. I mean --

MS. WEAVER: No.

MR. SPERLING: Your Honor, we saw this for the first time at 3:12 P.M., and I see that they're proposing to the Court --

THE COURT: Again --

MR. SPERLING: That they want to modify the letter of request to ask in their letter request to SEC for additional information.

I have nothing to say on that.

THE COURT: Hold on. I was very clear in my order, Ms. Weaver, what you were supposed to raise and not raise in this April 15th letter.

This is not one of the topics. It's just not.

I can't stress enough -- I'm sitting here struggling with all these different pages and all these different orders and all these different letters, because, again, it's become the gremlin case. Add water. Multiples.

And it is not the way to litigate. It's just not. And it's certainly not a way for me to case-manage. I prefer -- I pride myself in being very prepared, because I also tell people, help me help you.

The more prepared you are, the more prepared that I can be so I can help you resolve disputes that need to be resolved.

In terms of this issue that doesn't have anyplace in this letter, but I'm going to address it right now.

You can withdraw your current letters rogatory and file a new one. What do you want me to do?

MS. WEAVER: Your Honor.

THE COURT: Yeah. And then they're going to oppose it again? I mean, we're --

MS. WEAVER: Your Honor.

THE COURT: Yeah.

MS. WEAVER: If I may be heard.

THE COURT: Very briefly.

MS. WEAVER: We are learning about this just as you are. I don't know all about this data. I took three 30(b)(6) depositions last week for the first time and learned about these people for the first time.

And then in a hearing the next day, you told us that you might stay the case.

And so we had get on the record how we are being prejudiced.

And I just want to state, Your Honor, for the record, that in this -- if you deny us discovery of what happens prior to ACR operating and they make a contemporaneous argument about the timing of ACR operating, they will be prejudiced. We will not be able to answer that.

And with regard to these engineers, in my view, Your Honor, I made this call, I asked for the depositions of the engineers who have the knowledge because we need to get that to, both, prove the case for the time period, understand how it's collected, and I understand their defenses.

If you want us to withdraw, we can amend the SEC Hague -- we don't know the status of whether you will do it. But we would like to seek those depositions because that's what they are relying on for their personal knowledge.

And we've only had -- we've had four custodians -- two custodians -- three custodians in this case and these

three depositions. I am doing my best, Your Honor, to respond to everything you are asking directly. And we are learning this very complicated technology off -- there are all these terms of art: glass, frame -- I just learned all that last week myself.

THE COURT: All right. First of all -- and I am not -- this is not open a debate, and this is not for argument, and this is not for comment.

The SEC was a defendant in this case. Mr. Press voluntarily dismissed them. Okay? Who has created a whole host of problems, because now you can only get -- you can only get third-party testimony from the SEC. Okay?

So that's the first thing. They were in. You let them out.

In terms of you wanting to ask 30(b)(6) representatives of a nonparty, you can -- I am not going to sit here and have multiple briefs about your motion. So you can withdraw your motion, and you can refile it. That's your choice.

But I am not going to have you amend it, them oppose it -- and you're right. There will be most likely a stay in place -- because we still have to talk about mediation.

In terms of me -- my ruling that I just made denying you, I am not going to revisit that. I've heard for

over an hour today. This case is about ACR technology and what it does in terms of capturing, allegedly, private and confidential information from the plaintiff and the class.

I am not getting into the arguments you're both making about whether or not there is a legal conclusion to be drawn about whether or not there is a wiretap violation here or not. That's for both lawyers to do.

If you have an issue with my ruling, you have remedies. That's it.

Number 6, page 3, to the extent the SEA claims that information about realtime dataflow is not in the possession, plaintiffs are seeking discovery -- yup -- I don't -- are you asking me for something in Number 6? Or are you just telling me stuff?

MR. SAMRA: Your Honor, I think there's no dispute here other than our -- I mean, request for discovery from SEC.

THE COURT: And if that's all part of the motion, then that's under advisement, and I'll decide whether I grant or deny the motion. That's it. So ...

With respect to damages. Didn't I deal with this?

MR. SPERLING: Yes, Your Honor.

MS. WEAVER: Yes, Your Honor.

THE COURT: Okay. I don't know. Bottom of page 6 talks about there may be more disputes.

I don't know what they are, but it sounds like they're not ripe. So.

MR. SAMRA: Your Honor, there is one issue I would like to get on the record is our request for the agreements with third parties relating to ACR. We have taken the position that --

THE COURT: Wait. What? What?

This is something that was due? No, it's a new issue, and I am not hearing about it right now.

MR. SAMRA: It is in that sentence, Your Honor. That's why I brought it up.

THE COURT: Right.

But -- okay. Tell me where you're heading from. Tell me exactly what you're reading from.

MR. SAMRA: The sentence on page 2 of the -- the last paragraph of page 2. The sentence starting "consistent with the text's order" -- no -- "with the Court's order."

And then it's the -- it is SEA's refusal to produce certainly contracts pursuant to --

THE COURT: Is this a new dispute or something that you raised in January or March or when? What is this?

MR. SPERLING: It was raised in their March 1st letter, Your Honor.

THE COURT: And did I rule on it?

MR. SPERLING: You heard it and denied to grant

any relief when we were before you on March the 12th.

MR. SAMRA: Your Honor.

THE COURT: Hold on. Hold on and hold on.

Where did --

MR. SPERLING: I can -- in their March 1st letter, Your Honor.

THE COURT: No, no, no, where in my -- where in my March 14th order did I deal with this?

MR. SAMRA: It's not there, Your Honor.

MR. SPERLING: I would have to look to see if it's in the order, Your Honor. It was raised in their letter, and we addressed it at the hearing.

MR. SAMRA: It --

THE COURT: Hold on a minute. Hold on a minute, everybody.

I don't even know what this is.

MR. SAMRA: Your Honor --

THE COURT: SEA's refusal to produce certain contracts pursuant to RFP Number 28.

And, again, the parties can't even agree as to whether or not I even addressed this issue on the March 12th transcript.

So I am not dealing with this issue now. I'll review the transcript, and I will see whether or not I actually addressed this issue. If I think I need anything

further from you, I'll let you know. If I don't, I'll make a ruling if I need to.

MS. WEAVER: Your Honor, we do have additional evidence on the issue that we want to --

THE COURT: No. I don't want to hear it.

MS. WEAVER: Okay.

THE COURT: I want to see whether I addressed it.

If I addressed it and made a ruling, it's denied.

If I didn't, I'll figure out how to deal with this, another issue.

MR. SPERLING: Your Honor, it's --

THE COURT: If I have to review --

MR. SPERLING: It's referred to as "third-party contacts" in the transcript that is -- make it easier for the Court to find.

THE COURT: I don't know if this is supposed to be a comma or a semicolon after that.

What is this, 30(b)(6) testimony on Samsung's disclosures, i.e., Topic 4. Is that related to RFP 28?

MS. WEAVER: And, Your Honor. I apologize. But on the third-party contracts, the new 30(b)(6) testimony we have from Mr. Farr, which I --

THE COURT: No, no, no. Listen to me.

I want to know if I ruled on this issue or not.

MS. WEAVER: Okay.

THE COURT: But you're telling me, based on the 30(b)(6) testimony, now all of a sudden you want me to revisit it? Or you never ruled on it.

MS. WEAVER: Honestly, I -- to be honest, Your Honor, I don't know, as I sit here.

THE COURT: Okay.

MS. WEAVER: But what I can say --

THE COURT: Is you're saying, based on the 30(b)(6) testimony --

MS. WEAVER: They are violating their agreements with Netflix, and that goes to the tortious exception and the providers. So --

THE COURT: What?

MS. WEAVER: It's -- fine, Your Honor. We'll discuss it at another time. That's fine.

THE COURT: I don't even know what the issue is. I'm going to look to see whether I addressed it.

And I'm also going to be reviewing the deposition transcripts. So I'll have a good understanding exactly -- and this is to be clear -- we're talking about Farr; right?

MS. WEAVER: Yes, Your Honor.

THE COURT: Not the other custody- -- not the other 30(b)(6). It 's Farr. That's the issue for everything we're talking about today --

(Simultaneous conversation)

MS. WEAVER: For -- no. There's also Evans for some of the issues.

But Farr is what you -- you said you wanted to review --

(Simultaneous conversation)

THE COURT: Farr is the only one I'm going to look at. That's it.

MS. WEAVER: That's fine, Your Honor. Review Farr.

THE COURT: 30(b)(6) testimony on Samsung's disclosure, I, Topic 4.

Again, what is that? A whole new issue?

MR. SAMRA: Your Honor, this is one actually we have -- we have good news that we're continuing to discuss this and it's not ripe.

THE COURT: It's not good news. Resolved is good news to me.

You talking about it means it's just going to come back to me at some point. It better not, though.

So this one isn't ripe for me.

And the initial expert reports and disclosures deadline.

MR. SPERLING: Your Honor, I think we discussed in passing on Friday because -- I think the Court said the parties should not file their stipulation in light of the Court's intention to stay the case for three months.

We otherwise have agreement on extending the expert days just in light of the fact that the Court previously extended fact discovery. That's the only issue there.

THE COURT: All right.

What's going on with the mediator? I don't need to wait until April 19th.

MR. SPERLING: We're working on names, Your Honor, from defendant's side, including consideration of the particular candidates that Your Honor identified.

I expect by the end of the week, which I think is our deadline, we will have identified a couple of candidates. We'll try -- we'll discuss them with plaintiffs, first; see if we can reach agreement. But in all events, we can communicate to the Court --

THE COURT: Are these private mediators or through the Court mediation program?

MR. SPERLING: I think -- yeah, it would be both, Your Honor. It would be a mix with a focus on former judges from within this district but with Article III --

THE COURT: And the plaintiffs are doing the same?

MS. WEAVER: Yes. This is news to us. They have not shared that information with us.

But we are talking -- I will say this, Your Honor. We believe, given the state of discovery and certain preservation issues that staying this action will exacerbate

them, especially given the custody and control arguments with regard to SEC and fingerprint data and third-party data and new information we have received.

So we are concerned that it will cause prejudice if we cannot operate in parallel.

We will and always have mediated in good faith. There is a structural issue here, I believe, as to whether or not the parties can agree on whether there is a class action or not. We maintain that it is.

But we will do what Your Honor orders. I just wish the Court would consider not staying the case and ordering us into mediation so that we could proceed with both at the same time.

THE COURT: Whether or not the Court stays the case and orders the parties to mediation should have absolutely no bearing on a party's obligations to preserve ESI or anything else. Period. It doesn't matter. It doesn't matter.

If I stay a case, it doesn't mean obligations go out the window. Period.

So SEA knows its obligations. Plaintiff should know their obligations. And that is it.

MS. WEAVER: And SEC as well, Your Honor.

THE COURT: Well, I have no control over SEC.

MS. WEAVER: They're a third party. They're subpoenaed in this action; so ...

THE COURT: I understand that.

What I was about to say is there are motions pending with respect to SEC; right? They're not here. But if they don't preserve information based on these motions that are now before the Court, they do so at their own peril. I can't talk about what happened before the motions. I can only talk about they have -- they have their own obligations as third parties, like you said, that have been subpoenaed.

Now, in terms of mediators, you're supposed to report back to the Court on Friday. It's Tuesday.

I am not going to order you to share names, but the fact you haven't shared names doesn't give me any kind of comfort that you're going to be able to agree on any of those mediators by Friday, I assume I'll get from plaintiff and I assume I'll get the defendant. And that will be due Friday.

That's all I'm going to do about that.

Now, the last thing that I want to talk about is plaintiffs have indicated in the April 15th letter, page 3, proposing referral to a special master. I don't know the difference between a special master and a private discovery mediator, but it doesn't matter. That's the plaintiff's position, which I appreciate. It is something that I've raised a number of times as a possibility here. And I think I raised it at my prior -- if not at the prior hearing, then I certainly raised it in January.

I don't know what conference or hearing this is to resolve discovery disputes, which -- it was to address the latest round of unresolved disputes, which, as I mentioned, once again morphed into new discovery disputes that seem to be propounded every day.

The last three conferences were in January 2024; March 12th, 2024; and April 12th, 2024; here we are April 16th, 2024, where the Court's made rulings memorialized in various orders; for example Docket Entry 266, 287, and 299.

And in light of all this and also in light of the number of motions that are currently pending, such as plaintiff's pending motion to intervene; plaintiff's motion to compel compliance with a third-party subpoena, which is in a companion case, 24-4625; and the plaintiff's motion to issue letters rogatory, which they may withdraw and refile based on some additional information that they're seeking; includes extensive legal memoranda, exhibits regarding numerous discovery disputes -- party discovery disputes, and third-party discovery disputes -- I note there are a number of other discovery disputes that the parties raised in the April 15th letter. Some are -- the Court addressed today. Some, the Court has reserved on. Some, the parties still have to meet and confer on.

And originally as anticipated in what was going to

be their April 24th letter for another meet-and-confer that I was scheduling on April 25th -- and, again, the parties have met and conferred on numerous occasions pursuant to Federal Rule of Civil Procedure 37 and Local Civil Rule 37.1 to resolve these disputes, which they have made little progress on doing and, even still, multiple disputes remain -- and as I noted, the Court has held a series of conferences with the parties on these discovery issues in this case that's more than seven years old and the period to complete discovery has been and will need to be again extended on many occasions, and considering the procedural history of this case, the complexity and the number of pending disputes and the potential significant discovery disputes in the future, the Court foresees that this case will continue to demand a level of case management and resolution of discovery disputes that simply is not sustainable, given the docket congestion, the press of other matters on the Court's docket, and the fact that the bench is still down one magistrate judge, and so I intend to confer with District Judge Arleo about whether it is necessary and appropriate to appoint a special master in this case. And I'll determine with her if she thinks it is appropriate, whether that should or should be before or after the parties attempt to mediate the case.

Now, I will give both sides a chance to briefly be heard on this issue, as I'm required to do under the rule. I

am not making any rulings now about appointing a special master. But it is something, as I indicated to you for all the reasons above that I plan to confer with Judge Arleo about.

I know that the plaintiffs have indicated that they think it's appropriate to appoint a special master, so I can't imagine there's anything else that the plaintiff needs to add to that.

MS. WEAVER: Very quickly, we would either agree to participate in a private mediator, who we would have to find, if the Court's dockets are too busy. Or if you would rather refer a magistrate judge, we would be open to either, Your Honor.

THE COURT: Well, we have a special, you know, rule --

MS. WEAVER: Yes.

THE COURT: -- that pertains to how special masters are appointed. And that's under, you know, Federal 53, and we're just -- I'm going to be guided by that in terms of if Judge Arleo agrees and decides to appoint one. But I -- your points, I understand them. Thank you.

I'll hear you briefly.

MR. SPERLING: Thank you, Your Honor.

We very much understand the inordinate amount of time that Your Honor, Your Honor's clerks have had to devote

to this matter.

We think that those considerations actually point in the other direction, and I'll try and explain why.

There's been a process in place which Your Honor has been exquisitely clear about what should and should not be raised, when and how. And one side in this case keeps flouting that. Your Honor got a letter on March 1st that Your Honor was not supposed to receive. Your Honor got a letter on March 22nd that Your Honor has indicated should not be sent. Your Honor received a letter yesterday -- right? -- that includes all sorts of things that are beyond the scope of what Your Honor said to raise in the letter.

The Court in its diligence, its desire to move this case along has simultaneously reiterated to the parties, "Listen to my orders. You shouldn't be doing that," but in order to move the case along, has also chosen to address whatever issues get raised in those letters that were filed in violation of the Court's orders.

When I step back and look at that, it's hard to come to a conclusion other than that creates an incentive for plaintiff's counsel to continue flouting the Court's orders because what happens is that they get scolded and the Court gets overwhelmed, but the Court, in trying to be responsive and do its job, proceeds to address all the things that they raise that they were told not to raise.

So yesterday's letter is a perfect example -- all manner of things that we've never heard of. And Your Honor described how chambers couldn't even understand some of these things, and we couldn't either, and we heard what they meant for the first time this morning.

Discovery needs to come to an end at some point, and we recognize that there are some things that still need to happen before then. But special masters exist for the sake of more discovery. That's what always happens with special masters. They're given that position for the sake of attending to more discovery.

And I fear that appointing a special master is going to reward some of the bad conduct that's been exhibited here, is going to ensure that more and more new issues keep getting raised and issues continue to multiply, multiply. It's going to put the cost on us, to boot; not to say that we're happy that the Court is bearing the burden, but there's going to be a financial cost that gets put on us by virtue of that.

And I would suggest that at best it's premature pending the stay that Your Honor discussed -- right? -- and maybe it's something that should best be addressed after the stay and after attempted mediation.

But it is very hard for us to conclude how -- I'll end where I began, Your Honor -- I don't know how Your Honor

does it in chambers. I know how congested the docket is, and the Court is doing yeoman work to address these issues, and I get it's overwhelming and burdensome and frustrating.

I would respectfully submit that the better path here is to chart a path to bring discovery to a close, as Your Honor identified in the March 14th order and not charting a path that is just going to ensure a further proliferation of issues and a further extension of discovery, because that's what's going to happen if we appoint a special master.

THE COURT: All right. Thank you. Your point's well taken.

MR. SPERLING: Thanks, Your Honor.

THE COURT: As I said, I am not making any rulings. I will speak with Judge Arleo about this.

What is plaintiff intending to do about the motions rogatory?

MS. WEAVER: We've just heard your ruling. I don't think we've made a decision yet, but if we were going to seek to amend to add -- advice, maybe we should do that. And we could do it in short order.

THE COURT: No. I 'd rather you withdraw the motion and refile it --

(Simultaneous conversation)

MS. WEAVER: Right. Withdraw the motion and refile

it. Okay.

THE COURT: So I'd like you to let the Court know within a week that --

(Simultaneous conversation)

MS. WEAVER: Yes, we can do that.

THE COURT: -- either send a letter saying you're withdrawing the motion. Here's the new motion.

MS. WEAVER: Yes.

THE COURT: Or you're not going to do anything, and you're going to let them --

(Simultaneous conversation)

MS. WEAVER: I would suspect that we'll withdraw them and refile, Your Honor, given the guidance.

So --

THE COURT: So if you're going to do that, then I'll give you -- if you write that within a week, then I'll give you a week to refile the motion.

MS. WEAVER: Okay. That's fine, Your Honor. We can do that.

THE COURT: All right.

MS. WEAVER: I just want to be clear -- and I believe the Court understands us, we have never intended to or flouted the Court's orders. We are really trying to just do what we need do to prove our case.

THE COURT: All right. Thank you.

As I mentioned, I don't need a letter from you next week on that last issue. I will address it.

And here's what I will say: To the extent -- I am not going to hold -- whatever expert deadlines I have in there, you said -- yeah, I'm going to hold on that. But to the extent there are written discovery issues that you've identified in your April 14th letter are not ripe -- and let's be clear, I'm talking about ones that are in your April 15th letter. I don't want new ones. I have now this April 15th letter. It tells me what the standing issues are.

Discussions regarding SEC's refusal to certify certain records are admissible business -- why are we talking about evidentiary issues now? Why are we talking about this? I don't know.

But if that's something you want me to address, if you can't work it out, I'll probably deny it as premature. It just -- I don't know what we --

(Simultaneous conversation)

MS. WEAVER: We put -- how did those -- when the end of discovery was approaching for us to authenticate and seek business record exemptions or to seek discovery, to the extent that the defendant is arguing that its documents it has produced are not business records, which is what they are doing, we can defer that now until discovery is complete. But we had to propound -- we had a 30-day window to propound

discovery, and we needed to do that at that time.

THE COURT: All right. Well, here's what I'm going to do -- all -- I can't keep having this mushroom, like I said, into new issues and new requests and new disputes.

So you've identified in your April 15th letter that there are issues that the parties are either meeting and conferring on and you're saying they're not ripe -- the discussions regarding SEC's -- SEA's refusal to certify certain business records as admissible business records; SEC's failure to engage in good faith identification of custodians -- I've addressed that issue already.

Search for relevant -- I've addressed that issue already. I know I did. This is exactly what I addressed last -- on Friday.

SE -- so we get -- what is that?

MS. WEAVER: There is much new information about who has evidence relating to this case that came out in the depositions that we just took last week, Your Honor. Representations were made to this Court that only two people at SEA knew about ACR.

THE COURT: Send me all the deposition transcripts. And I'm going to make ruling --

MS. WEAVER: Okay.

THE COURT: -- on the papers. Period.

MS. WEAVER: Okay.

THE COURT: Send me all the deposition transcripts because --

MS. WEAVER: We will do that.

THE COURT: I am not -- this is it. We are not going to have any new discovery disputes.

This refusal about the production of certain third-party contracts, I told you I have to review that one.

This 30(b)(6) testimony on Samsung's disclosures, Topic 47, it's not ripe.

So are these the disputes in addition to what else I have addressed that I have to deal with, and you're going to give me briefing on the profits and some other rulings that I made today.

Separate and apart from what's subject of the motions that are pending before the Court, this is it. What we've addressed today are the disputes. I don't want to hear that there's going to be more disputes, because guess what? I'm going to make rulings, and either I'm going to grant the plaintiff's request or I'm going to deny the plaintiff's requests. I'm either going to order the defendants to produce stuff, or I am not. And that is going to be it.

There are no new disputes that should be raised in connection with written discovery. Period. Period.

And I don't want any more requests sent out on either side.

I am not saying discovery's going to be completed by whatever deadline I gave. What did I give? May 30th?

MR. SPERLING: May 31st, Your Honor.

THE COURT: But not to serve any new requests. It's not to serve any more requests for interrogatories to be served. Period. That's it.

And I will review the dep transcripts. And I will speak with Judge Arleo about appointing a special master or not.

I will review everything I've ordered you to give me. I gave deadlines, and I will speak with my clerks about taking the time to prepare the order for today because, as I said, I wish I could have the parties do it, but I don't have any faith it'll be done. So I will do it myself.

And right now, I don't have another status conference on this case. I'm going to have to take all of the outstanding issues that I was not, despite best efforts, able to resolve today. And I will decide when it's appropriate to have another status conference.

And I'll wait to get your proposed list of mediators. And see whether or not I'm going to stay the case, pending the outcome of mediation.

And then, like I said, if I do, then I will terminate the motions.

MS. WEAVER: Your Honor, one quick question about

the transcripts, I believe we have a rough but not final yet. We can get you rough tomorrow. I am not exactly sure when the final transcripts will be ready.

THE COURT: What does that mean? They're not certified?

MS. WEAVER: Yeah. They are not cleaned up, so the rough is sometimes little muddy. You can order it right after the deposition's taken. They're still largely -- we had a very good court reporter, and I think they're largely -- you can read them.

THE COURT: Can you get me -- will you have certified ones in a week?

MS. WEAVER: I don't know. Depends.

We can find out, Your Honor.

MR. SPERLING: We can probably get that done, Your Honor.

So why don't we say -- whatever time works for the Court.

I would say if we can't have them -- if we can have them within a week, we will. And if we can't, we'll provide the rough.

But if the Court doesn't want to wait that long --

THE COURT: I don't want to have an issue where people then want to start looking at errata sheets and say, oh, that is not what -- I've got to with honest with you. I

don't. I don't want that.

MS. WEAVER: Fair enough.

THE COURT: So give me certified --

MS. WEAVER: We will.

THE COURT: -- copies prepped by May 1st.

If you can't get them to me by May 1st, just let me know --

(Simultaneous conversation)

MS. WEAVER: And, Your Honor, we try to get them to you --

(Simultaneous conversation)

THE COURT: You talk -- talk to the reporter. You know, we don't want to spend for a daily, so -- or expedited basis, could we have a few extra days.

So try and get it to me by May 1. If you can't -- just tell me how much more time you need for the certified ones.

MS. WEAVER: We will do that, Your Honor.

THE COURT: And we're talking about three?

MS. WEAVER: Yes.

THE COURT: Or four?

MR. SPERLING: I think four to have everyone, Your Honor. There's a deposition of plaintiff as well. I think --

THE COURT: Do I need the deposition of the

plaintiff?

MS. WEAVER: Nothing arose today, Your Honor --

(Simultaneous conversation)

THE COURT: Does anyone think -- I don't want more to read. I want less.

Does anyone think I need to review the plaintiff's deposition?

MS. WEAVER: No.

MR. SPERLING: Your Honor, there were -- my hope is that it's a closed issue.

There were many, many instructions, many instructions to plaintiff not to answer questions.

THE COURT: Okay.

MR. SPERLING: Many.

MS. WEAVER: Based on privilege only, Your Honor.

And this is a new issue that they raised -- not --

THE COURT: Yes.

MS. WEAVER: -- met and conferred about --

(Simultaneous conversation)

MS. WEAVER: We've not -- I think the three 30(b)(6) deposition transcripts, Your Honor, is what you need.

THE COURT: Everyone's raising new issues.

What's your point, Mr. Sperling? What do you want from the Court? You know how it works; right?

MR. SPERLING: Your Honor, nothing. We want nothing from the Court other than to thank the Court for the time the Court spent. Really.

THE COURT: Look, I am not trying to be flip here. I -- I don't want to micromanage this case. I really don't want to micromanage this case. I don't like old cases on my docket. Period. I pride myself on trying to give everyone fulsome opportunity to take discovery and then see if you can't resolve by way of settlement to get it adjudicated on the merits.

And this is probably one of only two cases I'm unable to do that despite best efforts of my incredible law clerks and myself.

If you need me -- if you have a dispute and because I did not issue the original scheduling order and I'd have to look to see if my amended scheduling order has this language because I have it in every one of my orders: If you don't raise a dispute with the Court during the deposition, it's waived and you can't bring it up to me.

But since I don't know, as I sit here today, if I have that in my order, I am not going to hold you -- it's not going to hold that against you because if I don't have it in my order, then you didn't know.

So I'm asking you, is there something about the deposition testimony, the deposition of the plaintiff that

you seek Court intervention to resolve?

MALE SPEAKER: The dep was just yesterday, Your Honor, so we don't -- we haven't really had a chance to --

THE COURT: You know what happened at the deposition. What happened? What? She instructed him not to answer.

MR. SPERLING: So, Your Honor, there were -- and I am not quoting and I am not reading.

But there were many questions of the nature of, you know, what do you believe, what facts are you aware of, what you contend? And there were many, many instructions that said, if you learned that from conversations with your counsel, I instruct you not to answer.

That's not how privilege works. Privilege applies to communications. Privilege doesn't apply to facts.

THE COURT: So what are you saying, you want me to -- you guys want to brief this issue about privilege?

MR. SPERLING: No, Your Honor.

THE COURT: Is that what you want to do?

MR. SPERLING: No, Your Honor.

THE COURT: So you're not asking me to do anything -- you don't need any Court intervention about the deposition? Yes or no?

MR. SPERLING: Under the circumstances, no,

Your Honor. I think in other circumstances we would. We are very mindful of the incredible volume of issues before the Court. We're mindful that the Court has already taken upon itself to read three deposition transcripts.

While we've not had a chance to review the transcript of plaintiff's deposition, under the circumstances, since, as the Court says, we were there, we will not pursue this issue with the Court now.

THE COURT: All right. Then that's that. Then I won't -- I won't reviewing in -- unless you're not asking me to review anything.

Okay. If there's nothing else, then we're adjourned.

MR. SPERLING: Thank you, Your Honor.

MS. WEAVER: Thank you, Your Honor.

(Conclusion of proceedings)

Certification

I, SARA L. KERN, Transcriptionist, do hereby certify that the 160 pages contained herein constitute a full, true, and accurate transcript from the official electronic recording of the proceedings had in the above-entitled matter; that research was performed on the spelling of proper names and utilizing the information provided, but that in many cases the spellings were educated guesses; that the transcript was prepared by me or under my direction and was done to the best of my skill and ability.

I further certify that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

S/ Sara L. Kern 23rd of April, 2024

Signature of Approved Transcriber Date

Sara L. Kern, CET**D-338
King Transcription Services, LLC
3 South Corporate Drive, Suite 203
Riverdale, NJ 07457
(973) 237-6080